## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

-----------------------------------------------------------
ANCESTRY.COM OPERATIONS INC.,  :
ANCESTRY.COM DNA, LLC,  :
  :
      Plaintiffs,  :
  :  Civil Action No. __17:15CV737__
      v.  :
  :  J. BECKWITH
DNA DIAGNOSTIC CENTER, INC.,  :
  :
      Defendant.  :
-----------------------------------------------------------

## COMPLAINT FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, FALSE ADVERTISING AND BREACH OF CONTRACT, AND DEMAND FOR JURY TRIAL

Plaintiffs Ancestry.com Operations Inc. and Ancestry.com DNA, LLC (collectively referred to as "Ancestry"), for their Complaint, aver:

1. Ancestry asserts this Complaint against defendant DNA Diagnostic Center, Inc. ("DDC") following significant actual confusion in the marketplace resulting from DDC's unauthorized use in commerce of Ancestry's registered **ANCESTRY** trademark and confusingly-similar trademarks with DDC's competing products and services, all of which has been done intentionally with an intent to profit off of the enormous goodwill associated with Ancestry's well-established and registered trademarks.

## THE ANCESTRY FAMILY OF TRADEMARKS

2. Ancestry's use of the **ANCESTRY** trademark dates back to at least as early as 1983, when Ancestry began offering retail and mail order services, genealogical research services, publishing services, and computer hardware and software to the public.

3. Since 1983, Ancestry has grown into the leading source of genealogical

information in the world, with over two million subscribers.  Ancestry members have created more than 70 million family trees on Ancestry's website ***Ancestry.com***, which contains more than 6 billion individual profiles.  On average, more than 75 million searches are handled by Ancestry.com servers daily.  Ancestry has more than 1,300 employees located around the world, with approximately 1,000 employees in Utah, 175 employees in San Francisco, California, and 70 employees in Dublin, Ireland.

4.     Ancestry's revenues increased from $225 million in 2009 to $620 million in 2014.

5.     The **ANCESTRY** trademark is extremely well-known.  Ancestry now offers a wide-range of products and services under a family of trademarks beginning with its established **ANCESTRY** trademark, including: **ANCESTRY**, **ANCESTRY.COM, ANCESTRYDNA**, **ANCESTRYHEALTH, ANCESTRYACADEMY, ANCESTRYPROGENEALOGISTS**, **ANCESTRY HINTS, ANCESTRYK12, ANCESTRY.CA, ANCESTRY.CO.UK**, and **ANCESTRY.COM.AU**.

6.     Ancestry owns trademark registrations on the Principal Register or recently filed trademark applications for all of these trademarks in the U.S. Patent and Trademark Office, as set forth in Exhibit A, and in numerous foreign trademark offices throughout the world.

7.     More specifically, Ancestry owns a registration on the Principal Register for **ANCESTRY**, issued in 1990, for "books relating to genealogy, and printed forms relating to genealogy, namely, pedigree charts, family group sheets, research calendars, research extracts, and census forms; genealogical research services, and distributorship, retail, and mail order services in the field of genealogy publications, and computer hardware and software." *See* Exhibit B.

8.     In addition, Ancestry's use of the **ANCESTRY.COM** trademark dates back to at

least as early as 1997. Ancestry owns registrations on the Principal Register for **ANCESTRY.COM** for goods and services including but not limited to the following:

- Provision of genealogical information, namely, provision of educational, research and historical tables of genealogical information; providing genealogical information, namely, family history information services, namely, retrieving, recording and reviewing ancestral data via the global computer network; consultancy, information and advisory services relating to the aforesaid; and providing an on-line computer database in the field of genealogy information and family history information…

- Downloadable electronic publications in the nature of magazines and newsletters in the field of genealogy and family history; downloadable reports, tables and charts relating to genealogical historical data, family history data, census data, birth, marriage and death records…

- Printed publications in the nature of printed educational materials, printed charts and calendars, all in the field of genealogy, family history, genealogical historical data, family history data…

- Online retail store and mail order retail services featuring…genealogy and family history computer software, genealogy charts, genealogy and family history reports, genealogy and family history publications; services comprising the compilation and systematization of written communications and data in the field of genealogical and family history information...

- Publishing of books, magazines, e-books, audio books, and web magazines all in the field of genealogical historical data…

- Providing temporary use of non-downloadable computer software for use in the creation and publication of on-line journals and blogs in the field of genealogy and family history…

- Genealogical services, namely, genealogy research, provided in person and via the Internet…

*See* Exhibit B.

9. Ancestry owns and offers its services through numerous websites containing its **ANCESTRY** mark, including: *Ancestry.com*, *Ancestrydna.com*, *Ancestryacademy.com*, *Ancestryhealth.com*, *Ancestry.ca*, *Ancestry.co.nz*, *Ancestry.com*, *Ancestry.com.au*, *Ancestry.co.uk*, *Ancestry.se*, and *Ancestry.fr*.

10. On August 1, 2011, Ancestry filed an "intent to use" trademark application for the trademark **ANCESTRYDNA** with the U.S. Patent and Trademark Office. The Trademark Office noted Ancestry's prior rights in the **ANCESTRY** marks and determined that "no other similar registered or pending mark has been found that would bar registration."

11. A registration for the **ANCESTRYDNA** trademark was subsequently issued on the Principal Register for the following services: "providing an online resource center featuring information in the field of genetic and family history and genealogy; provision of information in the field of personal historical data and information, genealogy and family history; provision of information resulting from educational research in the field of personal historical data and information, genealogy and family history; providing genealogical information, namely, family history information services in the nature of retrieving, recording and reviewing ancestral data via the Internet; consultancy, information and advisory services relating to personal historical data and information, genealogy and family history; providing an on-line computer database in the field of personal historical data and information, genealogy information and family history information; genealogical services, namely, genealogy and family history research, provided in person and via the Internet." *See* Exhibit B.

12. Ancestry launched its **ANCESTRYDNA** products and services around May 2012. Ancestry designed the products and services to complement and build upon Ancestry's existing products and services provided under the **ANCESTRY** family of trademarks. The **ANCESTRYDNA** products and services were immediately successful.

13. Ancestry obtained DNA samples from more than 1 million people. More than 4 million third cousins and closer genealogical matches were discovered for Ancestry's customers.

## ANCESTRY'S REPEATED DISPUTES WITH DDC BEGINNING IN JULY 2012

14.     On our about July 29, 2012, Ancestry was contacted by a third party who was concerned about consumer confusion resulting from an online "LivingSocial" advertisement for "Ancestry DNA."  Confusingly, the LivingSocial ad was entitled "AncestryDNA" and advertised DDC's services at the website AncestrybyDNA.com.   The advertisement contained DDC's trademarks only in a very small font at the bottom of the ad, stating:

"AncestryDNA

AncestrybyDNA Test

Uncover the early chapters of your past with today's deal from AncestrybyDNA.com. Pay $97 (regularly $195) for an AncestrybyDNA test, with results available online…your DNA sample will be tested for your complete ancestry makeup…giving you results for your full ancestry…With a personalized ancestry test certificate and a detailed manual to explain and interpret your results online, you will have a clearer picture of where you come from – and possibly be able to close the book on some family mysteries."

15.     The description of goods and services in the advertisement discussed above mirrored the goods and services advertised through the same trade channels by Ancestry under its **ANCESTRYDNA** trademark.  To address the issue, Ancestry sent a cease and desist letter to DDC's counsel on August 8, 2012, demanding that DDC stop using a trademark that was identical to Ancestry's registered **ANCESTRYDNA** trademark.

16.     On August 10, 2012, DDC responded that: "for the purpose of short-term compromise, DDC agrees not to use AncestryDNA for the near term as you requested."  *See* Correspondence with David Cupar, Exhibit C.

17.     Ancestry believed that DDC would indeed cease use of the **ANCESTRYDNA** mark as agreed, but was again alerted (a month later) to infringing LivingSocial advertisements that were entitled **ANCESTRYDNA**, in direct violation of DDC's prior agreement (of only a month earlier) to cease using the mark and further distinguish its products and services from

Ancestry's products and services. Ancestry's counsel again contacted DDC's counsel in September 2012 about the infringement and DDC's counsel responded that he was discussing the issue with his client. The advertisements including the headline "Ancestry DNA" ceased shortly thereafter until December, 2014, when the advertisements appeared again, only this time on "Groupon." *See* Correspondence with Cupar, Exhibit C. Ancestry's counsel again exchanged emails with Mr. Cupar, and the advertisements utilizing **ANCESTRY DNA** again disappeared.

18. Meanwhile, in November 2013, DDC filed a new trademark application for the trademark **ANCESTRYBYDNA WORLDVIEW** for a range of services that overlapped with services identified in Ancestry's trademark registration for the **ANCESTRYDNA** trademark. Ancestry contacted DDC to object to the attempted use and registration of the mark and to alert DDC that it would oppose the application if it was published for opposition. DDC subsequently abandoned the trademark application.

19. Less than a year later, on October 13, 2014, DDC filed a trademark application for the trademark **ANCESTRYGPS** for a variety of goods and services, including goods and services overlapping with Ancestry's goods and services. Ancestry contacted DDC's counsel to object to the attempted use and registration of the mark and to alert DDC that it would oppose the application if it was published for opposition. The U.S. Patent and Trademark Office also refused DDC's application on the ground that there was a likelihood of confusion between the proposed **ANCESTRYGPS** mark and Ancestry's numerous existing registrations for its **ANCESTRY** family of trademarks. In response to the Trademark Office's refusal, DDC amended the identification of goods and services in the application so that the application only identified "genomic testing kits" and argued that there is no likelihood of confusion between the **ANCESTRYGPS** mark and Ancestry's existing **ANCESTRY** trademarks. The Trademark

Office has not yet acted on DDC's response.

20.     DDC has not yet abandoned the application for **ANCESTRYGPS** or committed to make no use of the mark.

### CONFUSION BETWEEN *ANCESTRY* AND *ANCESTRYBYDNA*

21.     Numerous consumers were confused by DDC's use of the trademarks **ANCESTRY**, **ANCESTRY DNA**, **DNA ANCESTRY**, and **ANCESTRYBYDNA** each time DDC advertised its competing products and services through a third party website such as Living Social or Groupon, in violation of DDC's prior agreement not to engage in this conduct.

22.     DDC's counsel repeatedly assured Ancestry that the conduct would cease, but the advertisements kept reappearing.

23.     DDC's conduct and its unauthorized use of Ancestry's trademarks escalated throughout 2015, with Ancestry becoming aware of increasing evidence of actual confusion and receiving numerous complaints from customers that had mistakenly purchased DDC's products and services, under a mistaken belief that they were purchasing Ancestry's products and services. In response to this new and profound evidence of actual confusion and the complaints about DDC's products and services, in August, 2015, Ancestry once again contacted DDC's counsel and forwarded the evidence of the actual confusion.  *See* Cease and Desist, Exhibit D.

24.     The parties attempted to discuss an amicable resolution to the matter between August and November, 2015, exchanging draft settlement agreements.

25.     Then, on or about November 4, 2015, Ancestry became aware of a new misleading DDC ad on Facebook, which appeared as follows:



26. DDC had merely changed the headline from "Ancestry DNA Test" to "DNA Ancestry Test."

27. In response to the misleading ad, consumers were confused into believing that it was an Ancestry ad, and multiple consumers reposted the ad incorrectly remarking that it was an ad for Ancestry's AncestryDNA product, for example:





28. Numerous consumers have posted comments indicating that they have mistakenly purchased DDC's product, believing it to be Ancestry's product, as a result of the deceptive advertising.

29. The confusion is exacerbated by the fact that the AncestryDNA product is also advertised through Groupon.

30.    Consumers noted the deception, for example:



31.    Ancestry emailed DDC's counsel regarding this ad on November 4, 2015, as evidence of DDC's bad faith during the parties' settlement discussions, and DDC's counsel responded: "As for the advertisement, it's not from DDC but rather Groupon so that it cannot be bad faith by DDC."

32.    DDC's position, that they are absolved from responsibility for ads for DDC's products, if the ads originate with one of their vendors – Groupon or LivingSocial – is absurd and contrary to the law.

33.    The parties' settlement discussions broke down thereafter and this lawsuit follows.

### DDC'S PURPORTED LIMITED TRADEMARK RIGHTS IN "ANCESTRYBYDNA"

34.    DDC allegedly acquired some limited rights to the mark "AncestrybyDNA" in 2010.

10

35. A company named DNA Print Genomics created a genomic test kit that it called the "AncestrybyDNA" test kit around 2002.

36. DNA Print Genomics was also using a variety of other trademarks in connection with its genomic test kits, such as **EUROPEANDNA**.

37. The company apparently did not use **ANCESTRYBYDNA** as a stand-alone brand; rather, it used the mark in conjunction with its **DNA PRINT GENOMICS** trademark and other trademarks. It also did not use **ANCESTRYBYDNA** to describe DNA Print Genomics' services; it used the trademark *only* as the name of a particular test kit.

38. DNA Print Genomics offered certain publishing and retail and mail order services, but DNA Print Genomics apparently offered those services under the different trademark **DNA PRINT GENOMICS**, *i.e.*, not a trademark containing the term "Ancestry." The company also did not aggressively advertise its products and services online or advertise through websites such as LivingSocial or Groupon. DNA Print Genomics also did not appear to offer its consumers any test results or other personal genealogy information online.

39. Around 2010, the company ceased doing business and assigned any limited rights that it possessed in the mark **ANCESTRYBYDNA** to DDC.

40. DNA Print Genomics did not seek to register the **ANCESTRYBYDNA** mark in connection with Ancestry's core services or related services, *i.e.,* genealogical research services, retail and mail order services, computer hardware and software, and publications. If it had, The Trademark Office would have rejected the application based upon a likelihood of confusion with Ancestry's existing trademark registrations. Instead, DNA Print Genomics filed an application to register the trademark **ANCESTRYBYDNA**, but only for genomic test kits. The Trademark Office issued a trademark registration for these very specific goods to DNA Print Genomics on

March 25, 2008.

41.     As stated above, prior to any use of the mark **ANCESTRYBYDNA** by DNA

Print Genomics, and beginning at least as early as 1997, Ancestry had already been using the

**ANCESTRY** and **ANCESTRY.COM** trademarks prominently in connection with a wide range

of genealogical research products and services and related publication services.

42.     DNA Print Genomics' registration for **ANCESTRYBYDNA** for genomic test kits

was assigned to DDC in 2010.

### DDC'S EXPANDED AND INFRINGING USE OF "ANCESTRYBYDNA" IN AN ATTEMPT TO CAPITALIZE ON ANCESTRY'S USE OF "ANCESTRYDNA"

43.     In 2012, a few months after the launch of Ancestry's **ANCESTRYDNA** service,

DDC <u>greatly</u> expanded its use of the **ANCESTRYBYDNA** trademark, apparently in an attempt

to capitalize on Ancestry's established goodwill in its **ANCESTRY** trademarks.

44.     DDC began using the trademarks **ANCESTRY** <u>and</u> **ANCESTRY DNA** by

themselves for the first time in connection with its online advertising.  Previously, DDC had used

the mark "AncestrybyDNA Presented by DDC," but at some point after Ancestry adopted the

mark "AncestryDNA," DDC removed the phrase "Presented by DDC" from its website.

45.     DDC also began a campaign of aggressive online advertising under the

**ANCESTRYBYDNA** trademark that it had purchased from DNA Print Genomics --  using the

mark not just as the name of a test kit, but as a stand-alone brand.  DDC also started advertising

on websites such as LivingSocial and Groupon, apparently for the first time in July 2012.

46.     DDC also departed from DNA Print Genomics' prior practice of merely using the

mark as the name of a test kit, creating publications entitled *AncestrybyDNA* and *Ancestry DNA*

and advertising personalized genealogical research services and Internet-based services to

consumers under the **ANCESTRYBYDNA** and **ANCESTRY DNA** marks for the very first

time.

47.     DDC is a company that specializes in paternity testing, not testing related to genealogy.  DDC also offers forensic and veterinary DNA testing.  DDC utilizes numerous trademarks across the United States that do not contain the **ANCESTRY** mark.  Previously, DDC apparently advertised its services through LivingSocial under the trademark **CONNECTMYDNA** and the website *www.connectmydna.com*.

48.     DDC's change in practices, as described above, was a clear attempt to capitalize on Ancestry's goodwill in its **ANCESTRY** and **ANCESTRYDNA** trademarks.

## JURISDICTION AND VENUE

49.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 as the present case arises under the Lanham Act, 15 U.S.C. § 1051 *et seq*., as amended, and as is hereinafter more fully described.

50.     All other claims asserted in this action arise out of the same transaction or occurrence, so that this court has supplemental jurisdiction over all additional claims asserted in this action under 28 U.S.C. § 1367(a).

51.     Ancestry.com Operations Inc. is a Delaware corporation with its principal place of business in Provo, Utah.

52.     Ancestry.com DNA, LLC, is a Delaware corporation with its principal place of business in Provo, Utah.

53.     DDC is an Ohio corporation with its principal place of business in Fairfield, Ohio.

54.     On information and belief, DDC is subject to the jurisdiction of this Court, and venue is proper in this District pursuant to 28 U.S.C. § 1391.

## COUNT I
## TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114

55. Ancestry repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though the same were fully rewritten herein.

56. Section 1114(1)(a) of Title 15 of the United States Code states, in pertinent part:

Any person who shall, without the consent of the registrant –

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive…shall be liable in a civil action…

57. DDC's use of the **ANCESTRY** trademarks in connection with competing goods and services, including confusingly-similar trademarks such as **ANCESTRY DNA** and **ANCESTRYBYDNA** is likely to cause confusion, mistake and deception among the public. In fact, numerous instances of actual confusion have already occurred and continue to occur.

58. DDC knew that its advertisements and use of confusingly similar trademarks were causing confusion, mistake and deception and continued using the **ANCESTRY** trademarks despite the clear evidence of trademark infringement and actual confusion.

59. Ancestry has not consented directly or indirectly to this use of the **ANCESTRY** trademarks and has expressed its strong written objection to the unauthorized use of the trademarks in connection with competing products, in a manner likely to cause confusion.

60. As stated, *supra*, Ancestry has used its **ANCESTRY** trademark and a family of related trademarks in connection with genealogical research services, publication services, and related services, since at least as early as 1983.

61. Ancestry's registrations for the **ANCESTRY** trademarks on the Principal Register are *prima facie* evidence of their distinctiveness.

62.     By virtue of the success of the products and services sold under Ancestry's trademarks, in addition to Ancestry's efforts to promote its products and business, and the enormous success of Ancestry's business, these trademarks have come to have significance in the mind of the relevant trade and purchasing public as an indicator of products and services originating with, sponsored by, or otherwise associated with Ancestry.

63.     As marks registered on the Principal Register in the U.S. Patent and Trademark Office, Ancestry's **ANCESTRY** trademarks are presumed be valid and distinctive under the Lanham Act and Ancestry is presumed to be the exclusive owner of the marks.

64.      DDC has used Ancestry's trademarks and terms confusingly-similar thereto with competing products and services.

65.     DDC's unauthorized and willful use of Ancestry's trademarks and extremely similar marks in connection with the sale of its goods and services constitutes a use in commerce that infringes Ancestry's exclusive rights in its marks and is likely to cause confusion, mistake or deception as to the source of the products and services offered.

66.     Such actions are also likely to cause and have caused confusion as to whether Ancestry is sponsoring, has authorized, or is somehow affiliated with the products or services of DDC.

67.     The parties' goods and services are related, as are the trade channels and purchasers for such products and services.  The same classes and types of persons will purchase the products and services offered in connection with the marks at issue.

68.     DDC's conduct constitutes trademark infringement in violation of 15 U.S.C. § 1114 and is being conducted with willful disregard of Ancestry's valuable trademark rights in its registered trademarks.

69. DDC's use of Ancestry's trademarks in connection with its products and services is a willful attempt to trade upon the goodwill that Ancestry has developed in its trademarks, including its **ANCESTRYDNA** trademark.

70. Ancestry has no adequate remedy at law.  DDC's conduct, if not enjoined, will cause irreparable damage to the rights of Ancestry in its trademarks and its business, reputation and goodwill.

71. Ancestry's damages from the aforesaid unlawful actions of DDC are not yet determined.

## <u>COUNT II</u>
## <u>TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE AND MISLEADING ADVERTISING UNDER 15 U.S.C. § 1125(a)</u>

72. Ancestry repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though the same were fully rewritten herein.

73. Section 1125(a) of Title 15 of the United States Code states, in pertinent part, the following:

> Any person who, on or in connection with any good or services, … uses in commerce any word, term, name, symbol, … or any false designation of origin, … which -- is likely to cause confusion, or to cause mistake, or to deceive…as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person…shall be liable in a civil action.

74. DDC's use of the trademark **ANCESTRY** and confusingly-similar marks such as **ANCESTRY DNA** and **ANCESTRYBYDNA** falsely suggests that Ancestry is the source of, or is somehow affiliated with the provision of, DDC's products and services, and is likely to deceive members of the relevant trade and public, into believing that DDC's products and services are affiliated with or offered in conjunction with Ancestry, in violation of 15 U.S.C. § 1125(a).

75.     DDC's conduct constitutes trademark infringement, unfair competition, false and misleading advertising, and false designation of origin in violation of 15 U.S.C. §1125(a).

76.     DDC's conduct is being conducted with willful disregard of Ancestry's valuable trademark rights in the **ANCESTRY** trademarks.  It represents a willful attempt to trade upon the goodwill that Ancestry has developed in the **ANCESTRY** trademarks through its many years of use of the **ANCESTRY** marks.

77.     Ancestry has no adequate remedy at law.  The said conduct of DDC has caused and, if not enjoined, will continue to cause irreparable damage to the rights of Ancestry in its **ANCESTRY** trademarks, reputation and goodwill.  Ancestry's damages from the aforesaid unlawful actions of DDC are not yet determined.

## COUNT III
## BREACH OF CONTRACT

78.     Ancestry repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though the same were fully rewritten herein.

79.     DDC stated that "for the purpose of short-term compromise, DDC agrees not to use AncestryDNA for the near term as you requested."  *See* Correspondence with Cupar, Exhibit C.

80.     This agreement was a contract.

81.     DDC then continued to use the **ANCESTRYDNA** trademark in its commercial advertising, *repeatedly*, and in a direct breach of its prior agreement with Ancestry.

82.     DDC's conduct caused damages to Ancestry in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Ancestry respectfully demands judgment:

a. That DDC, its officers, directors, agents, servants, employees, attorneys, confederates, related companies, licensees, and all persons acting for, with, by, through and under them, be preliminarily and permanently enjoined:

(1) from using any trademark confusingly-similar to Ancestry's trademarks in connection with any of the classes of goods and services identified in Ancestry's existing registrations on the Principal Register of the U.S. Patent and Trademark Office for **ANCESTRY**, **ANCESTRY.COM**, and **ANCESTRYDNA**, including but not limited to publications, genealogical research services, mail order services, and the provision of genealogical information and data to consumers through a website;

(2) from using any trademark confusingly-similar to Ancestry's trademarks in any manner likely to cause confusion, mistake or to deceive the relevant trade and public;

(3) from committing any acts calculated to cause consumers or the relevant trade to believe that DDC's goods and services are associated with or authorized by Ancestry; and

(4) from otherwise competing unfairly with Ancestry in any manner.

b. That DDC be ordered to abandon its pending trademark application for the **ANCESTRYGPS** trademark in the U.S. Patent and Trademark Office and cease seeking to register confusingly-similar marks containing Ancestry's **ANCESTRY** marks in connection with DDC's competing goods and services.

c. That DDC pay to Ancestry such damages as Ancestry has sustained as a consequence of DDC's infringement, unfair competition, and false and misleading advertising, and to account for and to pay to Ancestry:

(1) all gains, profits and advantages derived by DDC from its infringement;

(2)     all gains, profits and advantages derived by DDC from its unfair competition;

(3)     all gains, profits and advantages derived by DDC from its false advertising; and

(4)     all damages incurred by Ancestry as a result of DDC's infringement, unfair competition, and false advertising.

d.     That Ancestry be awarded treble and statutory damages pursuant to the Lanham Act, based on the willful nature of DDC's infringement.

e.     That Ancestry be awarded its reasonable attorney's fees and costs in this action, and

f.     That Ancestry be awarded such other and further relief as the court may deem equitable.

## **JURY DEMAND**

Ancestry hereby demands a trial by jury for all issues that are triable.

Respectfully submitted,

By:      _s/ Paul J. Linden_____
Paul J. Linden (OH. Reg. 0083699)
*Trial Attorney*
Glenn D. Bellamy (OH. Reg. 0070321)
WOOD, HERRON & EVANS, LLP
441 Vine Street, 2700 Carew Tower
Cincinnati, OH 45202
Tel: (513) 241-2324
Fax: (513) 2416234
Email: plinden@whe-law.com
Email: gbellamy@whe-law.com

Of Counsel:
Jordan A. LaVine
Alexis K. Arena
FLASTER/GREENBERG P.C.
1600 John F. Kennedy Blvd., 2nd Floor
Philadelphia, PA  19103
Tel: (215) 279-9393
Fax: (215) 279-9394
Email: jordan.lavine@flastergreenberg.com
Email: alexis.arena@flastergreenberg.com

*Attorneys for Plaintiffs*