**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

---------------------------------------------------------

ANCESTRY.COM OPERATIONS INC.,     :

ANCESTRY.COM DNA, LLC,     :     Civil Action No. 1:15-cv-00737-SSB-SKB

     :

     Plaintiffs,     :     Judge Sandra S. Beckwith

     :

     v.     :     Magistrate Judge Stephanie K. Bowman

     :

DNA DIAGNOSTIC CENTER, INC.,     :

     :     **ORAL ARGUMENT REQUESTED**

     Defendant.     :

---------------------------------------------------------

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Ancestry.com Operations Inc. and Ancestry.com DNA, LLC (collectively, "Ancestry"), move this Court pursuant to Fed. R. Civ. P. 65 for entry of an order granting Ancestry's motion for a preliminary injunction and enjoining Defendant DNA Diagnostic Center, Inc. from using the trademarks **ANCESTRY DNA**, **DNA ANCESTRY**, **ANCESTRYBYDNA**, **ANCESTRYBYDNA WORLDWIDE**, **ANCESTRYGPS**, and/or any other mark confusingly similar to the **ANCESTRY** family of marks, in commerce and in connection with the categories of goods and services described in Ancestry's existing trademark registrations for **ANCESTRY**, **ANCESTRY.COM** and **ANCESTRYDNA**.

This motion is supported by the accompanying memorandum of law, affidavits, and the exhibits thereto.

WHEREFORE, Plaintiffs respectfully request that their motion be granted.

Respectfully submitted,

Dated: November 24, 2015    By: _s/ Paul J. Linden_

Jordan A. LaVine, Esq. (pro hac vice pending)
Alexis K. Arena, Esq. (pro hac vice pending)
FLASTER/GREENBERG P.C.
1600 John F. Kennedy Blvd., Suite 200
Philadelphia, PA 19103
Tel: (215) 279-9393
Fax: (215) 279-9394
Email: jordan.lavine@flastergreenberg.com
Email: alexis.arena@flastergreenberg.com

and

Glenn D. Bellamy, Esq. (0070321)
Paul Linden, Esq. (0083699)
       *Trial Attorney*
Wood, Herron & Evans, L.L.C.
2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202-2917
Tel: (513) 241-2324
Fax: (513) 241-6234
Email: gbellamy@whe-law.com
Email: plinden@whe-law.com

*Attorneys for Plaintiffs Ancestry.com Operations Inc. and Ancestry.com DNA, LLC*

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

------------------------------------------------------

|  |  |  |
|---|---|---|
| ANCESTRY.COM OPERATIONS INC., | : | |
| ANCESTRY.COM DNA, LLC, | : | |
| | : | Civil Action No. 1:15-cv-00737-SSB-SKB |
| Plaintiffs, | : | |
| | : | Judge Sandra S. Beckwith |
| v. | : | |
| | : | Magistrate Judge Stephanie K. Bowman |
| DNA DIAGNOSTIC CENTER, INC., | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| Defendant. | : | |

-------------------------------------------------------

_____

**MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
_____

Respectfully submitted,

By:  _s/ Paul J. Linden_
        Jordan A. LaVine, Esq. (pro hac vice pending)
        Alexis Arena, Esq. (pro hac vice pending)
        FLASTER/GREENBERG P.C.
        1600 John F. Kennedy Blvd., Suite 200
        Philadelphia, PA  19103

        and

        Glenn D. Bellamy, Esq. (0070321)
        Paul Linden, Esq. (0083699)
               _Trial Attorney_
        Wood, Herron & Evans, L.L.C.
        2700 Carew Tower
        441 Vine Street
        Cincinnati, OH 45202-2917

Dated:  November 24, 2015        *Attorneys for Plaintiffs Ancestry.com Operations Inc. and*
                                         *Ancestry.com DNA, LLC*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................I

TABLE OF AUTHORITIES ........................................................................................... II

INTRODUCTION ............................................................................................................ 1

FACTS 3

A.     THE ANCESTRY FAMILY OF TRADEMARKS .............................................. 3

B.     DDC'S PURPORTED LIMITED RIGHTS IN "ANCESTRYBYDNA" AND ITS
       EXPANDED AND INFRINGING USE OF ANCESTRY'S MARKS IS AN
       ATTEMPT TO CAPITALIZE ON ANCESTRY'S GOODWILL AND WELL-
       ESTABLISHED REGISTERED MARKS........................................................... 5

C.     ANCESTRY'S REPEATED DISPUTES WITH DDC BEGINNING IN JULY 2012 ........... 6

D.     CONFUSION BETWEEN ANCESTRY AND ANCESTRYBYDNA .................................. 7

ARGUMENT .................................................................................................................. 10

A.     ANCESTRY HAS A STRONG LIKELIHOOD OF SUCCESS ON ITS LANHAM
       ACT CLAIMS. ................................................................................................... 11

       1.     Strength of the Plaintiff's Mark ................................................................ 11

       2.     Relatedness of the Goods ........................................................................... 13

       3.     Similarity of the Marks .............................................................................. 13

       4.     Evidence of Actual Confusion .................................................................... 15

       5.     Marketing Channels Used ........................................................................... 15

       6.     Likely Degree of Purchaser Care ............................................................... 16

       7.     Defendant's Intent in Selecting the Mark .................................................. 16

       8.     Likelihood of Expansion of the Product Lines .......................................... 17

B.     ANCESTRY IS SUFFERING IRREPARABLE HARM AS A DIRECT RESULT OF
       DDC'S ADOPTION AND USE OF THE "ANCESTRYBYDNA" TRADEMARK. ........... 19

C.     A PRELIMINARY INJUNCTION SHOULD BE GRANTED BECAUSE IT WILL
       NOT CAUSE SUBSTANTIAL HARM TO OTHERS AND THE PUBLIC
       INTEREST FAVORS IT ................................................................................... 20

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AutoZone, Inc. v. Tandy Corp.*,
373 F.3d 786 (6th Cir. 2004) ....................................................................................... 11, 13, 15, 16

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
363 F.3d 427 (6th Cir. 2004) ...................................................................................................... 10

*Circuit City Stores, Inc. v. CarMax, Inc.*,
165 F.3d 1047 (6th Cir. 1999) .................................................................................................... 19

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*,
109 F.3d 275 (6th Cir. 1997) ....................................................................................... 11, 17, 18

*Dominic's Rest. of Dayton, Inc. v. Mantia*,
No. 3:09-CV-131, 2009 WL 1838282 (S.D. Ohio June 24, 2009) .................................. 11, 13, 15

*Fisher Asset Mgmt., LLC v. Rider*,
No. 2:11–cv–11262012, WL 529589 (S.D. Ohio Feb. 17, 2012) .................................................. 10

*Ford Motor Co. v. Lloyd Design Corp.*,
22 F. App'x 464 (6th Cir. 2001) .................................................................................................. 18

*Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*,
453 F.3d 351 (6th Cir. 2006) ...................................................................................................... 12

*Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*,
701 F.3d 1093 (6th Cir. 2012) .................................................................................................... 11

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
730 F.3d 494 (6th Cir. 2013) ...................................................................................................... 11

*Hamad v. Woodcrest Condo. Ass'n*,
328 F.3d 224 (6th Cir. 2003) ...................................................................................................... 10

*Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*,
254 F. App'x 456 (6th Cir. 2007) ........................................................................................... 18, 20

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
502 F.3d 504 (6th Cir. 2007) ...................................................................................................... 12

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*,
453 F.3d 377 (6th Cir. 2006) ................................................................................................. 19, 20

*Ohio State Univ. v. Skreened Ltd.*,
16 F. Supp. 3d 905 (S.D. Ohio 2014) ..................................................................................... 15, 16

*Therma-Scan, Inc. v. Thermoscan, Inc.,*
    295 F.3d 623 (6th Cir. 2002) ................................................................................. 13, 14, 17, 18

**FEDERAL STATUTES**

15 U.S.C. § 1114 ................................................................................................................... 10

15 U.S.C. § 1125(a) ............................................................................................................... 10

**RULES**

Fed. R. Civ. P. 65 ................................................................................................................... 10

## INTRODUCTION

Plaintiffs, Ancestry.com Operations Inc. and Ancestry.com DNA, LLC (collectively "Ancestry"), seek a preliminary injunction because they are suffering irreparable harm to their business and reputation resulting from the conduct of defendant DNA Diagnostic Center, Inc. ("DDC").  DDC has caused significant actual confusion in the marketplace resulting from DDC's unauthorized use in commerce of Ancestry's registered **ANCESTRY** trademark and confusingly-similar trademarks in connection with DDC's competing products and services.  DDC caused this consumer confusion through its intentional, escalating encroachment into Ancestry's family of marks and Ancestry's products and services, in order to profit off of the enormous goodwill associated with Ancestry's registered trademarks.

Ancestry has used its **ANCESTRY** trademarks and brand name since as early as 1983, when Ancestry began offering retail and mail order services, genealogical research services, publishing services, and computer hardware and software to the public under the **ANCESTRY** mark.  Since that time, Ancestry has grown into the leading source of genealogical information in the world with over two million subscribers.   Ancestry's online presence dates back to at least as early as 1997 when Ancestry began using the **ANCESTRY.COM** trademark in commerce.  Ancestry owns and offers its services across the globe through numerous websites containing its **ANCESTRY** mark, including *Ancestry.com*.  Ancestry additionally owns trademark registrations on the Principal Register of the U.S. Patent and Trademark Office ("USPTO") for numerous marks containing its **ANCESTRY** trademark, including **ANCESTRYDNA**.  *See* List of "Ancestry" marks, attached to the affidavit of Alexis Arena ("Arena Aff.") as **Ex. A**.

Ancestry's rights to the **ANCESTRYDNA** mark, specifically, date back to when it filed an intent to use trademark application for the mark on August 1, 2011.  Ancestry then launched its **ANCESTRYDNA** product and service in 2012.

Since 2012, DDC has continuously escalated its efforts to encroach on the products and services that Ancestry offers under its **ANCESTRY** family of trademarks, causing increasing confusion in the marketplace.  Previously, DDC had used the mark "AncestrybyDNA Presented by DDC" in a limited manner, solely in connection with genomic test kits.  At some point after Ancestry adopted the mark **ANCESTRYDNA**, however, DDC removed the phrase "Presented by DDC" from its website and began a campaign of aggressive online advertising under the marks **ANCESTRYBYDNA**, **ANCESTRY DNA** and **DNA ANCESTRY** – using the **ANCESTRYBYDNA** mark not just as the name of a test kit, but also as a stand-alone brand.  Most recently, DDC began offering new, online genealogical services similar to Ancestry's services and began selling these services through misleading click-through advertisements, with headlines including **DNA ANCESTRY**, **ANCESTRY DNA**, and **ANCESTRYBYDNA**.  As a result of this deceptive advertising, an overwhelming number of consumers have been confused into mistakenly purchasing DDC's product, when they believed they were purchasing Ancestry's products.  In response to DDC's conduct, Ancestry has contacted DDC numerous times and obtained DDC's prior agreement not to engage in this conduct, but DDC has repeatedly breached this agreement.

DDC's defense to Ancestry's assertions was that in 2012, DDC acquired some rights in the trademark "AncestrybyDNA" from a third party.  However, any rights in the mark were limited to use of the mark as the name for genomic test kits that were delivered by mail.  Given Ancestry's pre-existing rights in the **ANCESTRY** mark, any rights that DDC could have acquired were extremely limited, and DDC has now intentionally expanded well beyond its prior use of the mark to capitalize on Ancestry's advertising and well-known family of brands.  Trademark protection exists to prevent this type of effortless profiteering and actual consumer confusion in the marketplace.  It is a rare case where a preliminary injunction movant can produce the substantial evidence of actual confusion in the marketplace that Ancestry can produce in this case, and this is no doubt a small fraction of the evidence of actual confusion that exists in this matter.  Hundreds of consumers have purchased

2

DDC's product under the mistaken belief that it is Ancestry's product, which results from DDC's intentionally-misleading advertisements. DDC's change in practices, as described above, constitutes a bad faith attempt to capitalize and profit off of Ancestry's goodwill in its **ANCESTRY** family of trademarks.

Accordingly, Ancestry seeks this court's assistance in resolving this dispute. Without immediate relief from this court, Ancestry will continue to suffer the irreparable damage resulting from DDC's flagrant violation of its trademark rights.

## FACTS

### A.      The ANCESTRY Family of Trademarks

Ancestry's use of the **ANCESTRY** trademark dates back to at least as early as 1983, when Ancestry began offering retail and mail order services, genealogical research services, publishing services, and computer hardware and software to the public. *See* Ancestry's trademark registrations issued by the U.S. Patent and Trademark Office ("USPTO") for **ANCESTRY**, **ANCESTRY.COM**, and **ANCESTRYDNA**, attached to Arena Aff., as **Ex. B**, at 2. Ancestry is now the leading source of genealogical information in the world with over two million subscribers. Ancestry members have created more than 70 million family trees on Ancestry's website ***Ancestry.com***, which contains more than 6 billion individual profiles. Ancestry's revenues increased from $225 million in 2009 to $620 million in 2014. On average, more than 75 million searches are handled by Ancestry.com servers daily. *See* Affidavit of Rob Singer ("Singer Aff."), at ¶¶ 2-6.

Ancestry now offers a wide-range of products and services under a family of trademarks beginning with its established **ANCESTRY** trademark, including: **ANCESTRY**, **ANCESTRY.COM**, **ANCESTRYDNA**, **ANCESTRYHEALTH**, **ANCESTRYACADEMY**, **ANCESTRYPROGENEALOGISTS**, **ANCESTRY HINTS, ANCESTRYK12, ANCESTRY.CA, ANCESTRY.CO.UK**, and **ANCESTRY.COM.AU**. Singer Aff. at ¶ 9. Ancestry owns trademark registrations on the Principal Register or recently filed trademark applications for all of these

trademarks in the USPTO, and in numerous foreign trademark offices throughout the world.  *See* Arena Aff., **Ex. A**.

Ancestry's use of the **ANCESTRY.COM** trademark dates back to at least as early as 1997. Singer Aff. at ¶ 7.  Ancestry owns registrations on the Principal Register for **ANCESTRY.COM** for a variety of goods and services, including but not limited to, "[p]roviding genealogical information, namely, family history information services, namely, retrieving, recording and reviewing ancestral data via the global computer network; consultancy, information and advisory services relating to the aforesaid; Online retail store and mail order retail services featuring…genealogy and family history computer software, genealogy charts, genealogy and family history reports, genealogy and family history publications; Genealogical services, namely, genealogy research, provided in person and via the Internet…"  Arena Aff., **Ex. B**, at 3-5.

Ancestry owns and offers its services through numerous websites containing its **ANCESTRY** mark, including *Ancestry.com*.  Singer Aff. at ¶ 8.  On August 1, 2011, Ancestry filed an "intent to use" trademark application for the trademark **ANCESTRYDNA** with the USPTO.  *Id.*. at ¶ 11.  The USPTO noted Ancestry's prior rights in the **ANCESTRY** marks and determined that "no other similar registered or pending mark has been found that would bar registration."  *See* **ANCESTRYDNA** trademark application and USPTO office action, attached to Arena Aff., as **Ex. C**, at 2-3.

A registration for the **ANCESTRYDNA** trademark was subsequently issued on the Principal Register for  services including but not limited to:  "provision of information in the field of personal historical data and information, genealogy and family history… consultancy, information and advisory services relating to personal historical data and information, genealogy and family history; providing an on-line computer database in the field of personal historical data and information, genealogy information and family history information; genealogical services, namely, genealogy and family history research, provided in person and via the Internet."  Arena Aff., **Ex. B**, at 5-6.

Ancestry launched its **ANCESTRYDNA** products and services around May 2012.  Ancestry designed the products and services to complement and build upon Ancestry's existing products and services provided under the **ANCESTRY** family of trademarks.  The **ANCESTRYDNA** products and services were immediately successful, and Ancestry obtained DNA samples from more than 1 million people.  More than 4 million third cousins and closer genealogical matches were discovered for Ancestry's customers.  Singer Aff. at ¶¶ 12-15.

**B.      DDC's Purported Limited Rights in "ANCESTRYBYDNA" and Its Expanded and Infringing Use of Ancestry's Marks is an Attempt to Capitalize on Ancestry's Goodwill And Well-Established Registered Marks.**

DDC allegedly acquired some limited rights to the mark "ANCESTRYBYDNA" in 2012.  A company named DNA Print Genomics created a genomic test kit that it called the "AncestryByDNA" test kit around 2002.  DNA Print Genomics did not seek to register the mark in connection with Ancestry's core services or related services, *i.e.,* genealogical research services, retail and mail order services, computer hardware and software, and publications.  Instead, DNA Print Genomics filed an application to register the trademark **"ANCESTRYBYDNA,"** but only for genomic test kits.  The Trademark Office issued a trademark registration for these very specific goods to DNA Print Genomics on March 25, 2008.  *See* "ANCESTRYBYDNA" Registration, attached to Arena Aff. as **Ex. D**, at 1.

DNA Print Genomics did not use "AncestryByDNA" to describe the services; it used the trademark *only* as the name of a particular test kit.  *See* Screenshots of ***www.ancestrybydna.com*** from March 13, 2008, Pages 1-2, attached to Arena Aff. as **Ex. E**.  DNA Print Genomics offered certain publishing and retail and mail order services, but DNA Print Genomics apparently offered those services under the different trademark **DNA PRINT GENOMICS**, *i.e.*, not a trademark containing the term "Ancestry."  *Id*.  The company also did not aggressively advertise its products and services online or advertise through websites such as LivingSocial or Groupon.  DNA Print Genomics also did not appear to offer its consumers any test results or other personal genealogy information online.

Prior to any use of the mark "ANCESTRYBYDNA" by DNA Print Genomics, and beginning as early as 1997, Ancestry had already been using the **ANCESTRY** and **ANCESTRY.COM** trademarks prominently in connection with a wide range of genealogical research products and services and publication services.  Singer Aff., at ¶ 7.  DNA Print Genomics' registration for ANCESTRYBYDNA for genomic test kits was assigned to DDC in **2012**.  Arena Aff., **Ex. D**, at 4.

In 2012, a few months after the launch of Ancestry's **ANCESTRYDNA** service, DDC greatly expanded the use of the **ANCESTRYBYDNA** mark, in a clear attempt to capitalize on Ancestry's established goodwill in its **ANCESTRY** trademarks.  *Compare* DDC's Website circa 2011 (Pgs. 3-4) *with* DDC's Website circa 2015 (Pgs. 10-11), Arena Aff., **Ex. E**, at 3-4; 9-10.  DDC began using the trademarks **ANCESTRY** and **ANCESTRY DNA** by themselves for the first time in connection with its online advertising.  Previously, DDC had used the mark "AncestrybyDNA Presented by DDC," but in 2013, after Ancestry had adopted the mark **ANCESTRYDNA**, DDC removed the phrase "Presented by DDC" from its website.  *See* Website Screenshots, **Ex. E**, Cease and Desist Correspondence, attached to Arena Aff. as **Ex. F**.

DDC also departed from DNA Print Genomics' prior practice of merely using the mark as the name of a test kit, creating publications entitled *AncestrybyDNA* and *Ancestry DNA* and advertising personalized genealogical research services and Internet-based services to consumers under the **ANCESTRYBYDNA** and **ANCESTRY DNA** marks for the first time.  *See* Arena Aff., **Ex. E**.  DDC is a company that specializes in paternity testing, not testing related to genealogy. DDC also offers forensic and veterinary DNA testing.  DDC utilizes numerous trademarks across the United States that do not contain the **ANCESTRY** mark.  *See* DDC website printouts, Arena Aff., **Ex. G**.

C.      **Ancestry's Repeated Disputes with DDC Beginning in August 2012**

Around August 2012, Ancestry first became aware of consumer confusion resulting from an online "LivingSocial" advertisement for "Ancestry DNA."  Confusingly, the LivingSocial ad was

6

entitled "Ancestry DNA" and advertised DDC's services at the website AncestrybyDNA.com.  The description of goods and services in the advertisement discussed above mirrored the goods and services advertised through the same trade channels by Ancestry under its **ANCESTRYDNA** trademark.  Arena Aff. **Ex. F**, at 12-14.

To address the issue, Ancestry sent a cease and desist letter to DDC's counsel on August 8, 2012, demanding that DDC stop using a trademark that was identical to Ancestry's registered **ANCESTRYDNA** trademark and advertising the genetic test kit in a confusing manner.  On August 10, 2012, DDC responded that: "for the purpose of short-term compromise, DDC agrees not to use AncestryDNA for the near term as you requested."  Arena Aff., **Ex. F**, at 8; 12-14.

Ancestry believed that DDC would indeed cease use of the **ANCESTRYDNA** mark as agreed, but was again alerted (a month later) to infringing LivingSocial advertisements that were entitled **ANCESTRYDNA**, in direct violation of DDC's prior agreement (of only a month earlier) to cease using the mark and further distinguish its products and services from Ancestry's products and services.  Ancestry's counsel again contacted DDC's counsel in September 2012 about the infringement and DDC's counsel responded that he was discussing the issue with his client.  The advertisements including the headline "Ancestry DNA" ceased shortly thereafter, until December, 2014, when the advertisements appeared again, only this time on Groupon.  *Id.* at 5-7.  DDC's counsel was again contacted, and the ads disappeared again.  Ex. F.  DDC also agreed to abandon the pending application it had filed for ANCESTRYBYDNA WORLDWIDE in response to Ancestry's March 2014 cease and desist letter.  Ex. F, at 11.  The application was abandoned in July 2014.

D.     **Confusion Between ANCESTRY and ANCESTRYBYDNA**

DDC's conduct and its unauthorized use of Ancestry's trademarks escalated throughout 2015, with Ancestry becoming aware of increasing evidence of actual confusion and receiving numerous complaints from customers that had purchased DDC's products and services, under a mistaken belief that they were purchasing Ancestry's products and services.  In response to this new

and profound evidence of actual confusion and the complaints about DDC's products and services, in August, 2015, Ancestry once again contacted DDC's counsel and forwarded the evidence of the actual confusion.  The parties attempted to discuss an amicable resolution to the matter between August and November, 2015, exchanging draft settlement agreements.  Singer Aff. at ¶¶ 16-18.

Then, on or about November 4, 2015, Ancestry became aware of a new misleading DDC ad on Facebook, which appeared as follows:



Singer Aff. at ¶ 19.

DDC had merely changed the headline from "Ancestry DNA Test" to "DNA Ancestry Test." In response to the misleading ad, consumers were confused into believing that it was an Ancestry ad, and multiple consumers reposted the ad incorrectly remarking that it was an ad for Ancestry's **ANCESTRYDNA** product, for example:



Numerous consumers have posted comments indicating that they had mistakenly purchased DDC's product, believing it to be Ancestry's product, as a result of the deceptive advertising.  *See* 53 Pages of Screenshots Depicting Consumer Confusion, attached to Arena Aff. as **Ex. H;** *see also* independent professional genetic genealogist CeCe Moore's online blogs detailing consumer confusion, attached to Arena Aff. as **Exhibit J**.  The confusion is exacerbated by the fact that the **ANCESTRYDNA** product is also advertised through Groupon.  Singer Aff. at ¶ 20.  Consumers noted the deception, for example:



9

Ancestry emailed DDC's counsel regarding this ad on November 4, 2015, as evidence of DDC's bad faith during the parties' settlement discussions, and DDC's counsel responded: "As for the advertisement, it's not from DDC but rather Groupon so that it cannot be bad faith by DDC." Singer Aff. at ¶ 21.

In addition, in October 2014, DDC filed a new trademark application with the USPTO for **ANCESTRYGPS**.  Arena Aff., **Ex. F**., **Ex. I**. The USPTO reviewed the application and concluded that the mark was confusingly-similar to Ancestry's registered marks.  *Id.*  In response, DDC argued that the marks were not confusingly similar and cited the **ANCESTRYBYDNA** registration.  *Id.* However, in August 2015, the USPTO maintained its refusal to register **ANCESTRYGPS**, on the basis that DDC's proposed mark was confusingly-similar to Ancestry's marks.  *Id.*

## ARGUMENT

DDC should be enjoined from using **ANCESTRYBYDNA**, **ANCESTRY DNA**, **DNA ANCESTRY**, and/or any other mark confusingly similar to Ancestry's trademarks (including DDC's new pending "intent to use" application for **ANCESTRYGPS**, which is pending before the USPTO but has been refused registration) in any manner that will continue to cause confusion, mistake, or deception to the relevant trade and public, pursuant to Fed. R. Civ. P. 65 and L. Civ. R. 65.  In ruling on a motion for preliminary injunction, a district court balances four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004).  These four factors are to be balanced and are not a list of prerequisites to be met.  *See Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (internal citation omitted).  "[T]he likelihood of success and irreparable harm factors predominate the preliminary injunction inquiry."  *Fisher Asset Mgmt., LLC v. Rider*, No. 2:11–cv–1126, 2012 WL 529589, at *3 (S.D. Ohio Feb. 17, 2012).

**A.**     <u>Ancestry Has a Strong Likelihood of Success On Its Lanham Act Claims.</u>

Ancestry can establish a likelihood of success on the merits of its Lanham Act claims for trademark infringement and unfair competition under 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a). The Sixth Circuit has held that the "touchstone of liability" for these claims is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

In order to determine likelihood of confusion, the Sixth Circuit employs an eight-factor test: "1) strength of the plaintiff's mark; 2) relatedness of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) likely degree of purchaser care; 7) defendant's intent in selecting the mark; [and] 8) likelihood of expansion of the product lines." *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100-01 (6th Cir. 2012) (internal quotation omitted). No single factor is dispositive, or even necessarily helpful in each case, but instead, courts balance all of the factors together. *See id.* at 1101. The ultimate purpose is to determine "whether an ordinary consumer would confuse the products at issue, which in fact come from different sources, as emanating from a single source…" *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 504 (6th Cir. 2013). By analyzing the factors alongside the marks at issue, there is overwhelming evidence that DDC's infringing use of **ANCESTRYBYDNA,** among other marks confusingly similar to Ancestry's trademarks, creates a likelihood of confusion in the minds of consumers.

    *1.*     **Strength of the Plaintiff's Mark**

Ancestry's trademarks are strong because the Ancestry brand has been extensively advertised since 1983, and Ancestry's online genealogical services have been accepted as the preeminent method for a consumer to uncover his or her ancestral roots. The strength of a trademark is determined by examining its distinctiveness. *See Dominic's Rest. of Dayton, Inc. v. Mantia*, No.

3:09-CV-131, 2009 WL 1838282, at *4 (S.D. Ohio June 24, 2009) (citing *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 793 (6th Cir. 2004)).  "A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both."  *Autozone, Inc.*, 373 F.3d at 793 (internal citation omitted).  A stronger mark is granted a higher level of protection, and "encroachment upon a strong mark is deemed more likely to produce confusion among buyers."  *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007).

Ancestry is the leading source of genealogical information in the world with over two million subscribers and the public recognizes Ancestry as the world's leader in this field.  Ancestry members have created more than 70 million family trees on Ancestry's website ***Ancestry.com***, which contains more than 6 billion individual profiles.  Ancestry's revenues increased from $225 million in 2009 to $620 million in 2014.  On average, more than 75 million searches are handled by Ancestry.com servers daily.  Ancestry has spent millions of dollars on advertising under its **ANCESTRY** family of marks through major television networks, print publications and online.  Singer Aff., ¶¶ 2-6.

The USPTO registered the mark **ANCESTRYDNA** on the Principal Register and noted Ancestry's prior rights in the **ANCESTRY** marks – determining that "no other similar registered or pending mark has been found that would bar registration."  Arena Aff., **Ex. C**.  The USPTO's finding was based on a conclusion that the mark was strong, distinctive and not descriptive; if it was considered descriptive without acquired distinctiveness, the examiner would have refused registration on that basis.  *Id*.  Ancestry has obtained DNA samples from more than 1 million people in connection with its **ANCESTRYDNA** product.  Singer Aff., ¶ 14.  Consumers discovered more than 4 million third cousins and closer genealogical matches using Ancestry's **ANCESTRYDNA** products and services.  *Id*. at ¶ 15.

Since **ANCESTRY** and related marks, such as **ANCESTRYDNA,** are established in the mind of consumers as the preeminent source of online genealogical services, and Ancestry has

extensively advertised under these marks, they should be entitled to a wide scope of protection. *See Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 356 (6th Cir. 2006).  DDC's encroachment onto these marks through its misleading use of **ANCESTRY DNA**, **DNA ANCESTRY**, and **ANCESTRYBYDNA** is therefore more likely to create confusion. *See Leelanau Wine Cellars, Ltd.*, 502 F.3d at 515.  Accordingly, this factor weighs in Ancestry's favor.

### 2. Relatedness of the Goods

The parties' respective marks are used in connection with the same goods and services, and accordingly, consumer confusion is likely.  In examining the relatedness of the goods and services, courts find that when the parties are in direct competition and the marks are sufficiently similar, consumer confusion is likely. *See AutoZone, Inc.*, 373 F.3d at 797.  The focus of this inquiry is "whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002).

Ancestry and DDC both advertise and offer the same online genealogical services under their respective marks.  Ancestry has offered online genealogical services under its **ANCESTRY** and **ANCESTRY.COM** trademarks since as early as 1997.  DDC, while initially only offering genomic test kits, greatly expanded its use of the "ANCESTRYBYDNA" mark and began offering online genealogical services recently.  Since the marks are all used in connection with identical goods and services, the relatedness of the goods weighs in Ancestry's favor.

### 3. Similarity of the Marks

DDC is using **ANCESTRY DNA, DNA ANCESTRY,** and **ANCESTRYBYDNA** to advertise its products.  These marks are identical or extremely similar to Ancestry's registered **ANCESTRY** and **ANCESTRYDNA** marks, and there is direct evidence of consumer confusion when DDC's marks have been viewed on their own.  Similarity of the marks is determined by

13

examining "the pronunciation, appearance, and verbal translation of the conflicting marks. *Dominic's Rest. of Dayton, Inc.*, 2009 WL 1838282, at *5 (citing *AutoZone, Inc.*, 373 F.3d at 795). The relevant inquiry is not whether they are sufficiently similar when viewed in a side-by-side comparison; instead, courts consider if "a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies." *Therma-Scan, Inc.*, 295 F.3d at 633.

Ancestry's family of **ANCESTRY** marks, including **ANCESTRYDNA,** are extremely similar to DDC's adopted marks.  After Ancestry launched its **ANCESTRYDNA** mark and online service, DDC took steps to avoid differentiating itself from Ancestry by intentionally removing "Presented by DDC" on its advertisements.  *See Therma-Scan, Inc.*, 295 F.3d at 634 (finding prominent display of brand name alongside mark in product packaging reduces the likelihood of confusion).  Numerous consumers, when viewing the **ANCESTRYBYDNA** trademark and online advertisements alone, were confused as to the source of the goods and services and assumed that **ANCESTRYBYDNA** is an Ancestry product, for example:

- Niel J. on October 10, 2015.
- Dotty L. on October 5, 2015.
- Beth S. on September 23, 2015.
- Kathleen B. on August 28, 2015.
- Jackie H. on August 4, 2015.
- Julie L. on July 5, 2015.
- Patricia W. on June 27, 2015.
- Lynne H. on June 24, 2015.
- Paulette R. on May 12, 2015.
- K.S. on March 17, 2015.

Arena Aff., **Ex. H** at 45-51.

The above list is just a sample of dozens of complaints regarding DDC's deceptive advertising.  Moreover, these are only examples of consumers who were so frustrated that they bothered posting about the confusion.  There are most likely hundreds or thousands of other consumers who were confused, but did not take the time to leave a comment on Yelp, Groupon, or Facebook.  Arena Aff., **Ex. J**.  Accordingly, the similarity of the marks weighs in favor of Ancestry.

### *4.* **Evidence of Actual Confusion**

As cited above, there are numerous examples in the past few months alone of actual consumer confusion resulting from DDC's infringing use of Ancestry's **ANCESTRY** and **ANCESTRYDNA** marks.  *See supra*, Arena Aff., **Exhibit H**.  The Sixth Circuit has held that evidence of actual confusion is the best evidence for establishing a likelihood of confusion.  *See AutoZone, Inc.*, 373 F.3d at 798; *Dominic's Rest. of Dayton, Inc.*, 2009 WL 1838282, at *6 ("Evidence of actual confusion is obviously the best evidence of a likelihood of confusion but is not required").  Numerous consumers were confused by DDC's use of the trademarks **ANCESTRY**, **ANCESTRY DNA**, **DNA ANCESTRY**, and **ANCESTRYBYDNA** each time DDC advertised its competing products and services through a third party website such as Living Social or Groupon, in violation of DDC's prior agreement not to engage in this conduct.  *See id.*

Accordingly, the evidence of actual confusion overwhelmingly weighs in favor of Ancestry.

### *5.* **Marketing Channels Used**

Ancestry and DDC share the same customer base and are using the exact same advertising services for their respective marks and goods and services.  The marketing channels factor examines "the parties' predominant customers and their marketing approaches."  *AutoZone, Inc.*, 373 F.3d at 793 (internal quotation omitted).  When both parties have the same customers and market their goods or services in similar or identical manners, consumer confusion is likely.  *See id.*  Additionally, the use of internet marketing "exacerbates the likelihood of confusion [because] entering a web site takes little effort – usually one click from a linked site… thus, web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store."  *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 914 (S.D. Ohio 2014).

As seen in the consumer confusion screenshots in **Exhibit H** to the Arena Aff., Ancestry and DDC both advertise their online genealogical services through Groupon and Living Social, and these advertisements frequently appear on Facebook.  Here, internet marketing "exacerbates the likelihood

of confusion" due to the minimal effort and time required to enter a web site via one click. *Ohio State Univ.*, 16 F. Supp. 3d at 914. The marketing channels used weighs in favor of Ancestry.

### 6. Likely Degree of Purchaser Care

The average consumer is exercising very little care in selecting the goods and services from Ancestry and DDC, and purchases the product with a few clicks of the mouse. The product is not prohibitively expensive (DDC is advertising its product for $69) and the consumer can purchase the product through a website such as Groupon in a matter of minutes, without ever reaching DDC's website or seeing a distinguishing mark such as "DNA Diagnostics Center." The likelihood of confusion is higher because the parties' products are being distributed in the same online environment with the same advertising companies. In general, courts analyze this factor by assuming that the typical buyer is exercising ordinary caution in his or her degree of purchaser care. *See AutoZone, Inc.,* 373 F.3d at 793. However, when the goods and services are offered in the same environment, such as the internet, the likelihood of consumer confusion increases because consumers are more likely to exercise comparatively little care in selection. *See Ohio State Univ.*, 16 F. Supp. 3d at 914 (citing *Leelanau Wine Cellars, Ltd*, 502 F.3d at 520).

As seen in the consumer confusion screenshots in **Exhibit H** to the Arena Aff., most consumers are exercising very little care in selecting online genealogical services and were instead mainly interested in taking advantage of a discount or sale on Groupon. Since Ancestry and DDC both advertise their goods and services online through the same advertising companies, the likelihood of consumer confusion increases, and in this case, there is substantial evidence of actual confusion as a result of DDC's deceptive advertising and use of infringing marks. Accordingly, likely degree of purchaser care weighs in favor of Ancestry.

### 7. Defendant's Intent in Selecting the Mark

DDC intended to create confusion by removing source identifiers from its advertisements for its products and services. When a party intentionally chooses a mark to create confusion between its

16

products and those of a competitor, "that fact alone may be sufficient to justify an inference of confusing similarity." *Therma-Scan, Inc.*, 295 F.3d at 638-39 (internal quotation omitted). Additionally, circumstantial evidence of copying – using a contested mark with direct knowledge of the protected mark – establishes an inference of intentional infringement. *See id.* at 639. The improper intent and bad faith of the alleged infringer constitutes strong evidence to support a likelihood of confusion, but the converse is not true. *See Daddy's Junky Music Stores, Inc.*, 109 F.3d at 287 ("Intent therefore is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer").

DDC removed any source identifiers from its advertisements, and its use of **ANCESTRYBYDNA** (among other iterations of **ANCESTRY**, **ANCESTRY DNA**, and **DNA ANCESTRY**) establishes a clear intent to create confusion in the minds of consumers.  DNA Print Genomics filed the application to register **ANCESTRYBYDNA**, but only for genomic test kits that were transmitted through the mail, or in person.  In 2012, DDC acquired the rights to the **ANCESTRYBYDNA** mark. DDC originally advertised its product as "AncestrybyDNA Presented by DDC," but at some point after Ancestry adopted the mark **ANCESTRYDNA**, DDC removed the phrase "Presented by DDC" from its website.  After Ancestry's counsel reached out to DDC in 2012 to inform DDC of the great amount of confusion created by its misuse of **ANCESTRYBYDNA**, DDC agreed to stop using **ANCESTRYBYDNA** indefinitely.  However, DDC eventually re-started use of **ANCESTRYBYDNA** – this time, without any source identifiers – after being informed of overwhelming evidence that the mark created consumer confusion.  DDC's improper intent and bad faith in using **ANCESTRYBYDNA** establishes a clear intent to create confusion among consumers. Accordingly, defendant's intent in selecting the mark weighs in favor of Ancestry.

> ### *8.*    **Likelihood of Expansion of the Product Lines**

DDC's expansion of its **ANCESTRYBYDNA** product line into online genealogical services is a direct encroachment of Ancestry's well-established marketplace for the **ANCESTRY** family of

marks, and accordingly, it has created a likelihood of consumer confusion. Evidence that a party will expand its product lines to encroach into the other side's goods and services offered with respect to a mark will support a finding of likelihood of confusion. *See Therma-Scan, Inc.*, 295 F.3d at 639; *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 287.

In this case, DDC has *already* encroached into Ancestry's product lines. DNA Print Genomics registered **ANCESTRYBYDNA** for genomic test kits. DDC then sought to expand further by registering **ANCESTRYGPS** and **ANCESTRYBYDNA WORLDWIDE**, clearly evidencing its intent to further profit from the use of Ancestry's well-known brand and family of marks. DDC is a company that specializes in paternity testing, not testing related to genealogy. Therefore, DDC's expansion into online genealogical services with its **ANCESTRYBYDNA** mark, after Ancestry had already registered and begun using its **ANCESTRYDNA** mark, is a clear-cut case of intentional encroachment by DDC into Ancestry's goods and services in order to profit off of Ancestry's goodwill. Likelihood of expansion of the product lines weighs in favor of Ancestry.

\*     \*     \*

All of the likelihood of confusion factors favor Ancestry. The court should find that Ancestry has carried its burden of showing a likelihood of confusion on its Lanham Act claims.

**B.** **Ancestry Is Suffering Irreparable Harm As a Direct Result of DDC's Adoption and Use of the "ANCESTRYBYDNA" Trademark.**

If a movant succeeds in establishing a strong likelihood of confusion, then "irreparable harm follows as a matter of course." *Ford Motor Co. v. Lloyd Design Corp.*, 22 F. App'x 464, 469 (6th Cir. 2001); *see also Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*, 254 F. App'x 456, 460 (6th Cir. 2007). Additionally, there is no law in the Sixth Circuit requiring a finding of irreparable harm to award injunctive relief. *See Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) ("[A] court need only find that a defendant is liable for infringement or unfair competition [under the Lanham Act] for it to award injunctive relief"). In trademark infringement actions, irreparable harm flows not from the quality or lack thereof of the alleged infringer's goods, but rather, from the senior user's "loss of control over the quality of goods that bear its marks." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006).

Because Ancestry has carried its burden of demonstrating a likelihood of confusion, irreparable harm should follow as a matter of course. There is substantial evidence of actual consumer confusion which demonstrates that Ancestry has lost control of the quality of goods that bear its marks. *See* Arena Aff., **Ex. H**. In addition, monetary damages are difficult to quantify with regard to issues of reputation and consumer preference because here is no reliable, methodical way to measure how many consumers stumble upon **ANCESTRYBYDNA** and, out of confusion, lend it the goodwill generated by Ancestry – and never search further to find the more established brand and service. Ancestry is suffering irreparable harm as a direct result of DDC's adoption and misuse of the **ANCESTRYBYDNA** trademark, and accordingly, this Court should find that Ancestry has carried its burden of showing irreparable harm.

19

**C.**    **A Preliminary Injunction Should Be Granted Because It Will Not Cause Substantial Harm to Others And The Public Interest Favors It.**

DDC would not suffer any legitimate harm by having to stop using its infringing marks in a deliberate attempt to leech off of Ancestry's strong brand and goodwill.  DDC is a company that specializes in paternity, forensic, and veterinary testing, not testing related to genealogy.  DDC only expanded into the online genealogical services market with its **ANCESTRYBYDNA** mark once Ancestry began its **ANCESTRYDNA** service.  Therefore, online genealogical services are a minor percentage of DDC's business, and DDC cannot argue that it will incur harm by having to stop the use of its deliberate and infringing use of **ANCESTRYBYDNA**.

The consuming public has a protectable interest in "preventing confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Ignition Athletic Performance Grp.,* 254 F. App'x at 460; *see also Lorillard Tobacco Co.,* 453 F.3d at 383. The evidence of actual confusion in this case strongly supports the conclusion that a preliminary injunction should be granted to protect the public's interest in being free from confusion as to the source of DDC's **ANCESTRYBYDNA** goods and services.

### CONCLUSION

For the foregoing reasons, Ancestry respectfully requests that this Court grant its motion for preliminary injunction and order that defendant DNA Diagnostic Centers, Inc. (and its related entities, affiliates, partners and agents) be required to cease using the confusingly similar marks **ANCESTRY DNA, DNA ANCESTRY, ANCESTRYBYDNA** and/or any other mark containing **ANCESTRY** in connection with the same types of goods and services offered by Ancestry and identified in Ancestry's existing trademark registrations.

Respectfully submitted,

By:  *s/ Paul J. Linden*

Dated:  November 24, 2015        Jordan A. LaVine, Esq. (pro hac vice pending)
Alexis Arena, Esq. (pro hac vice pending)
FLASTER/GREENBERG P.C.
1600 John F. Kennedy Blvd., Suite 200
Philadelphia, PA  19103
Tel: (215) 279-9393
Fax: (215) 279-9394
Email: jordan.lavine@flastergreenberg.com
Email: alexis.arena@flastergreenberg.com

Glenn D. Bellamy, Esq. (0070321)
Paul Linden, Esq. (0083699)
    *Trial Attorney*
Wood, Herron & Evans, L.L.C.
2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202-2917
Tel: (513) 241-2324
Fax: (513) 241-6234
Email: gbellamy@whe-law.com
Email: plinden@whe-law.com

*Attorneys for Plaintiffs*

21