**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ANCESTRY.COM OPERATIONS INC.
ANCESTRY.COM DNA, LLC,

      Plaintiffs,                  Civil Action No.1:15-cv-737

      vs.                        Beckwith, J.
                               Bowman, M.J.

DNA DIAGNOSTIC CENTER, INC.

      Defendants.

**REPORT AND RECOMMENDATION**

This case is presently before the Court on Plaintiffs' Ancestry.com Operations Inc. and Ancestry.com DNA, LLC (collectively "Ancestry") motion for a preliminary injunction and to enjoin Defendant DNA Diagnostic Center, Inc. from using the trademarks ANCESTRY DNA, DNA ANCESTRY, ANCESTRYBYDNA, ANCESTRYBYDNA WORLDWIDE, ANCESTRYGPS, and/or any other mark confusingly similar to the ANCESTRY family of marks, in commerce and in connection with the categories of goods and services described in Ancestry's existing trademark registrations for ANCESTRY, ANCESTRY.COM and ANCESTRYDNA (Doc. 8) as well as the parties responsive memoranda. (Doc. 29, 33, 34, 35).

A hearing was held on the motion on January 29, 2016. Having fully considered the pleadings and the arguments of the parties at the hearing, the undersigned herein recommends that Plaintiffs' motion for a preliminary injunction be GRANTED, in part.

## I.  BACKGROUND AND FACTS

### A.  The Parties

Plaintiff Ancestry is the leading source of genealogical information in the world with over two million subscribers. Ancestry members have created more than 70 million family trees on Ancestry's website *Ancestry.com*, which contains more than 6 billion individual profiles. On average, more than 75 million searches are handled by Ancestry.com servers daily.  (Doc. 8*,* Affidavit of Rob Singer ("Singer Aff."), at ¶¶ 2-6).

Ancestry offers a wide-range of products and services under a family of trademarks beginning with its established ANCESTRY trademark, including: ANCESTRY, ANCESTRY.COM, ANCESTRYDNA, ANCESTRYHEALTH, ANCESTRYACADEMY, ANCESTRYPROGENEALOGISTS, ANCESTRY HINTS, ANCESTRYK12, ANCESTRY.CA, ANCESTRY.CO.UK, and ANCESTRY.COM.AU. (Singer Aff. at ¶ 9). Ancestry owns trademark registrations on the Principal Register or recently filed trademark applications for all of these trademarks in the USPTO, and in numerous foreign trademark offices throughout the world. (Doc. 8, Affidavit of Alexis Arena ("Arena Aff."), Ex. A).

Ancestry's use of the ANCESTRY.COM trademark dates back to at least as early as 1997. (Singer Aff. at ¶ 7).  Ancestry owns registrations on the Principal Register for ANCESTRY.COM for a variety of goods and services, including but not limited to, "[p]roviding genealogical information, namely, family history information services, retrieving, recording and reviewing ancestral data via the global computer; consultancy, information and advisory services relating to the aforesaid; online retail store and mail

order retail services featuring…genealogy and family history computer software, genealogy charts, genealogy and family history reports, genealogy and family history publications; Genealogical services, namely, genealogy research, provided in person via the Internet…" (Doc. 8, Arena Aff., Ex. B, at 3-5).

On August 1, 2011, Ancestry filed an "intent to use" trademark application for the trademark ANCESTRYDNA with the USPTO. *Id.* at ¶ 11. The USPTO noted Ancestry's prior rights in the ANCESTRY marks and determined that "no other similar registered or pending mark has been found that would bar registration." *See* Doc. 8, ANCESTRYDNA trademark application and USPTO office action, attached to Arena Aff., as Ex. C, at 2-3.

Thereafter, in May 2012, Ancestry launched its ANCESTRYDNA products and services. Ancestry designed the products and services to complement and build upon Ancestry's existing products and services provided under the ANCESTRY family of trademarks.

Defendant, DNA Diagnostic Center (DDC) is a DNA testing company in Fairfield, Ohio. (Doc. 33, Silver Decl., ¶ 1). Its DNA testing is widely used in areas including criminal investigations, paternity disputes, medicine, and, relevant here, is used for learning about one's ancestry through DNA. (Doc. 33, Baird Decl., ¶¶ 3-5.)

Around 2002, a company named DNA Print Genomics created a genomic test kit that it called the "AncestryByDNA" test kit. Notably, DNA Print began its use of the ANCESTRYBYDNA mark in 2001. (Baird Decl., ¶ 10; *see* Ex. S-2.) DNA Print sold the test with the mark on its website from at least 2002 until 2009. (Silver Decl., ¶ 4; *see also* Baird Decl., ¶16).

On August 12, 2005, DNA Print applied for a federal registration for the ANCESTRYBYDNA mark for a "genomic test comprised of swabs used to collect test samples for analyzing DNA information for ancestry purposes." (Silver Decl., ¶ 5; *see* Ex. S-2, ANCESTRYBYDNA Reg.). The Trademark Office issued a trademark registration for these very specific goods to DNA Print Genomics on March 25, 2008. (Doc. 8, "ANCESTRYBYDNA" Registration, attached to Arena Aff. as Ex. D, at 1).

DNA Print also promoted the AncestrybyDNA test through resellers who used the ANCESTRYBYDNA mark in 2007 and 2008, and perhaps earlier, to sell the AncestrybyDNA test, including such sellers as Genelex, Sorenson, and DDC. (Silver Decl., ¶ 9). As a reseller, DDC offered the AncestrybyDNA test on its DNA Roots website in 2007 and 2008. (*Id.*, ¶¶ 7-8, 21; Ex. S-3, DNA-Roots.com Webpages, 2007 & 2008.).In 2009, DDC took over as an exclusive license of DNA Print and updated the website. (Doc. 33, Silver Decl.*,* ¶ 12). The new website offered the same test as the prior website controlled by DNA Print and, like the earlier website, offered that test under the ANCESTRYBYDNA mark. (*Id.*) That same year, DDC promoted the AncestrybyDNA test on television through *The Lopez Tonight Show* and later on *The Maury Povich Show* and through online deal sites, such as Groupon and Living Social. (Doc. 33, Silver Decl., ¶ 21; Baird Decl., ¶¶ 13, 14).

Since at least 2009, DDC has placed the ANCESTRYBYDNA mark on the test test results. (Doc. 33, Baird Decl., ¶ 13, 14; Silver Decl., ¶ 22; Ex. S-4, AncestrybyDNA Webpage, Dec. 2, 2009; Ex. S-5, AncestrybyDNA Results Certificates, 2010; Ex. S-6, AncestrybyDNA Results Certificates, 2016). Before that, DNA Print did the same. (*Id.*, ¶

15.) In terms of sales, DNA Print had at least $500,000 in sales of the AncestrybyDNA in 2008, and DDC has enjoyed sales of $3 million since then. (Silver Decl., ¶ 10).

DNA Print Genomics' registration for ANCESTRYBYDNA for genomic test kits was assigned to DDC in 2012. (Doc. 8, Arena Aff., Ex. D, at 4). On March 5, 2014, DDC filed a declaration of incontestability for the mark under Section 15 of the Lanham Act. (Ex. A, Declaration of Incontestability.)

   B. *Alleged Infringement*

Around August 2012, Ancestry first became aware of alleged consumer confusion resulting from an online "LivingSocial" advertisement for "Ancestry DNA." Confusingly, the LivingSocial ad was entitled "Ancestry DNA" and advertised DDC's services at the website AncestrybyDNA.com. (Arena Aff. Ex. F, at 12-14). Ancestry sent a cease and desist letter to DDC's counsel on August 8, 2012, demanding that DDC stop using a trademark that was identical to Ancestry's registered ANCESTRYDNA trademark and advertising the genetic test kit in a confusing manner. On August 10, 2012, DDC responded that: "for the purpose of short-term compromise, DDC agrees not to use AncestryDNA for the near term as you requested." (Arena Aff., Ex. F, at 8; 12-14). In September 2012, Ancestry was again alerted to alleged infringing LivingSocial advertisements that were entitled ANCESTRYDNA, in direct violation of DDC's prior agreement (of only a month earlier) to cease using the mark and further distinguish its products and services from Ancestry's products and services. Ancestry's counsel again contacted DDC's counsel in September 2012 about the infringement and DDC's responded that he was discussing the issue with his client. The advertisements

the headline "Ancestry DNA" ceased shortly thereafter, until December, 2014, when the advertisements appeared again, only this time on Groupon. (*Id.* at 5-7). DDC's Counsel was again contacted, and the ads disappeared again. (Doc. 8, Ex. F). DDC also agreed to abandon the pending application it had filed for ANCESTRYBYDNA WORLDWIDE in response to Ancestry's March 2014 cease and desist letter. (Doc. 8 Ex. F, at 11). The application was abandoned in July 2014.

In 2015, Ancestry learned of complaints from customers that had purchased DDC's products and services, under a mistaken belief that they were purchasing Ancestry's products and services. In response to this new and profound evidence of actual confusion and the complaints about DDC's products and services, in August, 2015, Ancestry once again contacted DDC's counsel regarding the customer confusion. The parties attempted to discuss an amicable resolution to the matter between August and November, 2015, exchanging draft settlement agreements. (Doc. 8 Singer Aff. at ¶¶ 16-18).

Thereafter, on or around November 4, 2015, Ancestry became aware of a new misleading DDC ad on Facebook, which appeared as follows:



Consumers were confused into believing that it was an Ancestry ad, and multiple consumers reposted the ad incorrectly remarking that it was an ad for Ancestry's ANCESTRYDNA product, for example:



In response to this Groupon ad, numerous consumers have posted comments indicating that they had mistakenly purchased DDC's product, believing it to be Ancestry's product, as a result of the deceptive advertising. (*See* doc. 8, Arena Aff. as Ex. H; *see also* independent professional genetic genealogist CeCe Moore's online blogs detailing consumer confusion, attached to Arena Aff. as Exhibit J). The confusion is exacerbated by the fact that Plaintiff's ANCESTRYDNA product is also advertised through Groupon. (Singer Aff. at ¶ 20). Consumers noted the deception, for example:



Ancestry emailed DDC's counsel regarding this ad on November 4, 2015, as evidence of DDC's bad faith during the parties' settlement discussions, and DDC's counsel responded: "As for the advertisement, it's not from DDC but rather Groupon so that it cannot be bad faith by DDC." (Singer Aff. at ¶ 21).

In addition, in October 2014, DDC had also filed a new trademark application

the USPTO for ANCESTRYGPS. (Arena Aff., Ex. F., Ex. I). The USPTO reviewed the application and concluded that the mark was confusingly-similar to Ancestry's marks. *Id*. In response, DDC argued that the marks were not confusingly similar and cited the ANCESTRYBYDNA registration. *Id*. However, in August 2015, the USPTO maintained refusal to register ANCESTRYGPS, on the basis that DDC's proposed mark was confusingly-similar to Ancestry's marks. *Id*.

        C.    *The Instant Action and Preliminary Injunction Motion*

In light of the foregoing, in November 2015, Ancestry filed suit against DDC and moved for preliminary injunction. (*See* Docs. 1, 8). They allege that DDC has infringed Ancestry's rights to three registered trademarks: (i) ANCESTRY (Reg. No. 1,577,711) for "periodicals . . . relating to genealogy . . ." (ii) ANCESTRY.COM (Reg. No. 3,852,700) for "electronic databases in the field of genealogical historical data . . .," and (iii) ANCESTRYDNA (Reg. No. 4,280,444) for "providing scientific analysis in the field of genetic and family history and genealogy . . . ."

On January 29, 2016, the undersigned held an evidentiary hearing on Ancestry's motion for a preliminary injunction. The Court heard testimony from Ancestry's witnesses: Robert Singer, Ancestry's Chief Marketing Officer and CeCe Moore, genetic genealogy expert and blogger; and DDC's witnesses: Dr. Michael Baird, Chief Science Officer and Laboratory Director at DDC and David Silver, Vice President of Marketing at DDC. The Court also heard arguments from counsel and entered exhibits into evidence.

## II.  STANDARD OF REVIEW

Preliminary injunctive relief is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it.  *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc)).

In determining whether to issue a preliminary injunction, the Court must examine four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Overstreet,* 305 F.3d at 573; *McPherson,* 119 F.3d at 459.  These factors are not prerequisites, but are factors that are to be balanced against each other.  *Id.*

The purpose of a preliminary injunction "is merely to preserve the relative of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Therefore, courts have identified certain types of preliminary injunctions that are "particularly disfavored," including preliminary injunction motions that alter the status quo and mandatory injunctions, i.e. injunctions that require a party to affirmative steps. *See Allen v. Shawney*, No. 11-10942, 2011 WL 5838480, at *4 (E.D. Mich. Oct. 5, 2011).   Ordering a party to stop using a trademark is a mandatory rather than an injunction preserving the status quo. *See Shepard's Co. v. Thompson Corp. ex rel. West Group Div.*, No. C-3-99-318, 1999 WL 777944, at *4 (S.D. Ohio July

15, 1999).

### III.  ANALYSIS

*A.  Likelihood of success on the Merits*

In order to establish a likelihood of success on the merits in a Lanham Act claim for trademark infringement and unfair competition under 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), the moving party must establish that the use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

To determine likelihood of confusion, the Sixth Circuit employs an eight-factor "1) strength of the plaintiff's mark; 2) relatedness of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) likely degree of purchaser care; 7) defendant's intent in selecting the mark; [and] 8) likelihood of expansion of the product lines." *Georgia-Pac. Consumer Prods. LP v. Four-U-Inc.*, 701 F.3d 1093, 1100-01 (6th Cir. 2012) (internal quotation omitted. The ultimate purpose is to determine "whether an ordinary consumer would confuse the products at issue, which in fact come from different sources, as emanating from a single source…" *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 504 (6th Cir. 2013). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case." *Homeowners Grp., Inc. v. Home Mktg.*

*Inc.,* 931 F.2d 1100, 1107 (6th Cir.1991). While all of these factors are relevant, actual confusion is "obviously the most probative proof of the likelihood of confusion." *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1190 (6th Cir.1997).

Applying these factors to the evidence of record militates strongly towards likelihood of confusion. Notably, the undersigned finds that Ancestry's trademarks are strong. As noted above, Ancestry has used its ANCESTRY trademarks and brand name since as early as 1983, when Ancestry began offering retail and mail order services, genealogical research services, publishing services, and computer hardware and software to the public under the ANCESTRY mark. Since that time, Ancestry has grown into the leading source of genealogical information in the world with over two million subscribers. Ancestry's online presence dates back to at least as early as 1997 when Ancestry began using the ANCESTRY.COM trademark in commerce.

Next, the parties' respective marks are used in connection with similar goods and services. The undersigned recognizes that DNA testing is not always similar to genealogy, as many DNA tests are used to confirm identify or for reasons other than those related to genealogy. Traditional genealogy aims to identify direct ancestors, mainly through public records. More recently, DNA testing, which tests chromosomes in a laboratory to enable a person to identify ancestral groupings to which he or she belongs, has been used more frequently in genealogical studies. (Ex. E at 20, 93-94). However, both Ancestry and DDC advertise and offer similar DNA testing products under their respective marks as they relate to ancestral discoveries.

Ancestry offers online genealogical services under its ANCESTRY and

ANCESTRY.COM trademarks.  DDC offers genomic test kits and online genealogical services under the "ANCESTRYBYDNA" mark.  DDC has also used ANCESTRY DNA, DNA ANCESTRY, and ANCESTRYBYDNA to advertise its products.

Such marks are substantially similar to Ancestry's registered ANCESTRY and ANCESTRYDNA marks. Furthermore, Ancestry provided substantial evidence that numerous consumers were confused by DDC's use of the trademarks ANCESTRY, ANCESTRY DNA, and DNA ANCESTRY in its advertisements through third party websites such as Living Social or Groupon as outlined above.  In this regard, numerous consumers were confused as to the source of the goods and services and assumed that ANCESTRYBYDNA was an Ancestry product.  (Doc. 8, Arena Aff., Ex. H at 45-51).

Furthermore with respect to marketing, Ancestry and DDC both advertise their online genealogical and DNA testing services through Groupon and Living Social, and these advertisements frequently appear on Facebook.  With respect to customer care, the product is not prohibitively expensive (DDC is advertising its product for $69) and the consumer can purchase the product through a website such as Groupon in a matter of minutes, without ever even reaching DDC's website or seeing a distinguishing mark such as "DNA Diagnostics Center."

Considering the last two factors, there is no evidence in the record that DDC intended to create confusion it its marketing of its AncestrybyDNA product, although Ancestry argues to the contrary.  As noted above, DDC acquired the mark from DNA Print Genomics in 2012.  DDC's goals were to retain a valid, registered trademark and maintain continuity with DNA Print's prior business. (Doc. 33, Silver Decl., ¶ 19).  Last,

Ancestry asserts that DDC's expansion of its ANCESTRYBYDNA product line into genealogical services is a direct encroachment of Ancestry's well-established marketplace for the ANCESTRY family of marks. However, although DDC filed an intent-to-use application for ANCESTRYGPS, no declaration of use has been filed, as trademark has not been used. (Doc. 29, Ex. R, Status Page for ANCESTRYGPS).  As ANCESTRYBYDNA WORLDVIEW, DDC filed this application on an intent-to-use basis, but has since abandoned its application without using it in commerce. (Doc. 29, Ex. S, Status Page for ANCESTRYBYDNA WORLDVIEW).

Notwithstanding the last two factors, the totality of the material presented by Plaintiffs in support of their motion for preliminary injunction demonstrates a likelihood of confusion, at least in part. Namely, DDC's use of ANCESTRY, ANCESTRY DNA, and DNA ANCESTRY in its advertisements has clearly led to customer confusion, as evidenced by the customer comments outlined above.

Although this analysis strongly drives the Court's analysis of the need for a preliminary injunction, the Court will briefly address the other factors as well.  *See Butler v. Hotel California, Inc.*, 106 F. Supp. 3d 899, 907 (N.D. Ohio 2015).

   *B. Irreparable harm, harm to others, the public interest*

With respect to irreparable harm, Ancestry claims that irreparable harm "follows a matter of course" if the movant in a trademark case is able to establish likelihood of success on the merits. See *Ford Motor Co. v. Lloyd Design Corp.* 22 Fed. App'x 464, (6th Cir. 2001). *See also Jae Enterprises, Inc. v. Oxgord Inc.*, No. 5:15-CV-228-TBR, 2016 WL 319877, at *11 (W.D. Ky. Jan. 25, 2016) (citing *Lorillard Tobacco Co. v.*

*Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006) (Sixth Circuit does not require a particular finding of the likelihood of irreparable harm to support injunctive in trademark infringement cases when there is a likelihood of success on the merits).

DDC, however, contends that Ancestry cannot establish irreparable harm because it delayed in seeking injunctive relief for at least three years after receiving actual notice of DDC's use of ANCESTRYBYDNA.  See *Realty Executives Int'l, Inc. v. Belfiori*, No. 10-12392, 2010 WL 2604669, at *1 (E.D. Mich. June 18, 2010) (where the movant has demonstrated a lack of diligence by waiting for an extended period of months from the time of the alleged infringement before seeking injunctive relief, the delay undermines [the movant's] allegation of irreparable harm) (citations omitted); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir. 1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.").

However, although Ancestry was aware of DDC's use of the marks at issue, the parties were amicably working together to resolve any customer confusion surrounding DDC's advertisements on the third party sites, such as Groupon and Living Social.

For the purpose of an injunction, "irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation its trademark ... because loss of control over one's reputation is neither calculable nor precisely compensable." *CFE Racing Products, Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 596 (6th Cir. 2015) (citing *Juicy Couture, Inc. v. Bella Int'l Ltd.,* 930 F.Supp.2d 489, 503

(S.D.N.Y.2013) (quotations omitted).   Notably, the remedial purpose of the injunction must be "to restore to the plaintiff the rightful control over its mark and eliminate the likelihood of confusion of the defendants' products with those of the plaintiff."   *Id*. at 596. Accordingly, the undersigned finds that Ancestry has met its burden in establishing irreparable harm.

Moreover, the Court is sensitive to Ancestry's concern that the confusion surrounding DDC's DNA test kit and its online reviews could reflect negatively on the good will and reputation associated with Ancestry. The Court finds at this stage that the likelihood of confusion between the marks is such that there is a public interest in protecting Plaintiffs' exclusive right to the mark.   More specifically, DDC's use of ANCESTRY, ANCESTRY DNA, and DNA ANCESTRY in its advertisements has clearly led to customer confusion, as evidenced by the customer comments outlined above.

However, the use of the word "ancestry" should not be enjoined. Notably, DDC argues that ancestry is a descriptive word that is permitted to use despite Plaintiffs' trademark of ANCESTRY.  A descriptive mark "specifically describes a characteristic or ingredient of an article." *Therma-Scan, Inc. v. Thermoscan, Inc*, 295 F.3d 623, 631 (6th Cir. 2002).  Descriptive marks, as opposed to suggestive, arbitrary, or fanciful marks, the weakest kind of protectable marks. *See id.*  Notably, at the evidentiary hearing, Robert Singer, Ancestry's Chief Marketing Officer, testified that Ancestry is not a company and decides how far to pursue those it deems to be in violation of their trademark depending on the use of "ancestry" with a capitol or a lowercase "A".  Thus, there would be little to no confusion if DDC advertised "An ancestry test."  Although the

Court will note that the better practice would be for DDC to utilize the marketing strategy has recently employed on Groupon where it advertises a "DNA Origins Test." (Arena at Ex. L).

Furthermore, Ancestry's requests to enjoin DDC from using ANCESTRYBYDNA and/or AncestrybyDNA are not well-taken. DDC owns these marks. As noted above DNA Print Genomics' registration for the ANCESTRYBYDNA trademark for genomic kits was assigned to DDC in 2012. (Arena Aff., Ex. D, at 4). Moreover, DNA Print registered ANCESTRYBYDNA with the USPTO in March 2008. As such, the undersigned finds that DDC's continued use of this mark is proper.[1] Additionally, it appears that DDC has abandoned its application for ANCESTRYGPS and ANCESTRYBYDNA WORLDVIEW, DDC. As such, Ancestry's request for an injunction is moot in this respect. The Court recognizes and has considered the fact that DDC incur some cost in complying with this decision, but the possibility of expense alone not outweigh the public interest in preventing confusion as to the origin of services.

### IV. Conclusion

For the foregoing reasons, it is herein **RECOMMENDED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Doc. 8) be **GRANTED PART,** and Defendant DNA Diagnostic Center, Inc. be enjoined from using the trademarks **ANCESRTY, ANCESTRY DNA and/or DNA ANCESTRY**, in commerce in connection with the categories of goods and services described in Ancestry's existing

---

[1] Ancestry argues that DDC's ANCESTRYBYDNA trademark should be cancelled because DDC committed fraud on the trademark office by failing to continuously use the mark in commerce for the past five years. Ancestry's contention is premature and not well-taken within the context of Ancestry's preliminary injunction motion. The Court may revisit this issue when addressing the merits of this action.

trademark registrations for ANCESTRY, ANCESTRY.COM and ANCESTRYDNA.

       s/ Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ANCESTRY.COM OPERATIONS INC.
ANCESTRY.COM DNA, LLC,

       Plaintiffs,                           Civil Action No.1:15-cv-737

       vs.                                 Beckwith, J.
                                           Bowman, M.J.

DNA DIAGNOSTIC CENTER, INC.
       Defendants.

**NOTICE**

      Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **14 DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **14 DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).