IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ancestry.com Operations, Inc., )
et al.. )
 )
              Plaintiffs, )    Case No. 1:15-CV-737
 )
   vs. )
 )
DNA Diagnostics Center, Inc., )
 )
              Defendant. )

**O R D E R**

This matter is before the Court on Plaintiffs' ("Ancestry") Motion (Doc. No. 51) to Dismiss Counts V, VI and VIII from Defendant's ("DDC") First Amended Counterclaims (Doc. No. 46). For the reasons that follow, Ancestry's motion to dismiss is **GRANTED IN PART AND DENIED IN PART.**

I. Background

Defendant DNA Diagnostics Center, Inc. is a "DNA testing business" based in Fairfield, Ohio. Counterclaim, Doc. No. 46 ¶ 11. Since incorporating in 1995, DDC has offered various DNA testing products and services, including "forensic DNA testing, relationship testing using DNA methodology, DNA testing for medical purposes, and ancestry testing." *Id.* ¶ 12. DDC's ancestry testing is called AncestrybyDNA, and has been sold since 2001 under the ANCESTRYBYDNA mark. *Id.* ¶¶ 13-14. In 2008, the United States Patent and Trademark Office ("USPTO") granted trademark registration for ANCESTRYBYDNA on the principal register. *Id.* ¶ 20. The mark has since

1

become incontestable. *Id.* ¶ 24. While originally operating under an exclusive license from DNA Print, DDC obtained full ownership of the AncestrybyDNA test in 2012. *Id.* ¶¶ 21-22.

Conversely, Ancestry.com allows customers to research their ancestry "through historical records such as birth, death, and marriage certificates and census data." *Id.* ¶ 26. In 2007, as its third ancestry DNA testing product, Ancestry launched "AncestryDNA" which operates under the ANCESTRYDNA trademark. *Id.* ¶¶ 30-31. DDC alleges that the ANCESTRYDNA mark is confusingly similar to DDC's "preexisting and registered ANCESTRYBYDNA mark." *Id.* ¶ 33. Further, prior to selecting the ANCESTRYDNA mark, Ancestry had "at least constructive knowledge of DDC's ANCESTRYBYDNA mark based on the federal registration of that mark in 2008." *Id.* ¶ 35). When Ancestry began using the ANCESTRYDNA mark for the first time in 2012, consumer confusion commenced between that mark and DDC's preexisting ANCESTRYBYDNA mark. *Id.* ¶ 36. As a result, "DDC has suffered and will continue to suffer significant harm to its reputation and goodwill, and to its sales and revenues, among other things." *Id.* ¶ 39.

In 2015, Ancestry filed this action alleging that DDC's use of the ANCESTRYBYDNA mark infringes Ancestry's trademark rights. *Id.* ¶ 43. In its counterclaim, however, DDC asserts that Ancestry's claims are "objectively baseless" for four main reasons: (1) DDC's ANCESTRYBYDNA trademark predates Ancestry's ANCESTRYDNA mark by more than ten years, and therefore it is Ancestry's mark that infringes DDC's trademark rights; (2) DDC's

2

mark cannot infringe upon Ancestry's purported rights, as there is no likelihood of confusion; (3) DDC's use of Ancestry is protected by fair use, and thus "such use cannot constitute trademark infringement under 15 U.S.C. §1115(b)(4); and (4) Ancestry's ANCESTRY mark is generic and not protectable. *Id.* ¶ 44.

DDC asserts that Ancestry, as the junior mark registrant, is actually responsible for the marketplace confusion, and likewise filed this lawsuit "with the bad faith intent of using the filing and allegations in its complaint to create the false appearance that DDC is to blame for the confusion that Ancestry has caused, which is contrary to law and fact, with the bad faith intent of damaging DDC's reputation, goodwill, and business." *Id.* ¶ 45. Further, DDC alleges that Ancestry submitted a complaint to Groupon "which falsely accused DDC of infringing the ANCESTRYDNA mark, caus[ing] Groupon to cease offering deals for DDC's AncestrybyDNA test to Groupon customers" and causing a "significant loss of sales and revenue." *Id.* ¶ 46.

DDC filed a number of counterclaims against Ancestry, including claims of unfair competition through malicious litigation (Count V), common law unfair competition (Count VI), and tortious interference with business relationships (Count VIII). Ancestry now moves to dismiss these claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. Standard of Review

A motion to dismiss for failure to state a claim operates to test the sufficiency of the complaint. The court must construe the complaint in the light most favorable to Plaintiff, and accept as true all well-pleaded factual allegations.

3

*See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). The court need not accept as true legal conclusions or unwarranted factual inferences. *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998).

The complaint, however, must contain more than labels, conclusions, and formulaic recitations of the elements of the claim. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The factual allegations of the complaint must be sufficient to raise the right to relief above the speculative level. *Id.* Nevertheless, the complaint is still only required to contain a short, plain statement of the claim indicating that the pleader is entitled to relief. *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Specific facts are not necessary and the pleader is only required to give fair notice of the claim and the grounds upon which it rests. *Id.*

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Mere conclusions, however, are not entitled to the assumption of truth. *Id.* at 678-89. A claim is facially plausible if it contains content which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. Plausibility is not the same as probability, but the complaint must plead more than a possibility that the defendant has acted

4

unlawfully. *Id.* If the complaint pleads conduct that is only consistent with the defendant's liability, it fails to state a plausible claim for relief. *Id.*

For the purposes of this Order, all well-pleaded factual allegations from DDC's counterclaim are accepted as true.

### III. Analysis

#### A. *Noerr-Pennington* Immunity

Ancestry argues that Counts V, VI and VIII of DDC's counterclaim should be dismissed pursuant to the *Noerr-Pennington* Doctrine. The *Noerr-Pennington* Doctrine provides immunity from liability from claims based on a party's efforts to petition governmental agencies for official action. *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 683-84 (6th Cir. 2012). The *Noerr-Pennington* Doctrine is "based on the right to seek redress in the courts," and ensures that a party will "not be subjected to liability for its attempt to have its rights protected by the courts unless that attempt is shown to have been a mere 'sham.'" *Melea Ltd. v. Quality Models, Ltd.*, 345 F. Supp. 2d 743, 758 (E.D. Mich. 2004); *see also Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 326 (6th Cir. 2006) (*Noerr-Pennington* "protects litigants who seek redress of wrongs through judicial proceedings"). The sham litigation exception to the *Noerr-Pennington* Doctrine withholds immunity from suit when petitioning conduct is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of another." *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961). "Sham litigation," while ostensibly instituted to influence

5

governmental action, is really an "attempt to interfere directly with the business relationships of a competitor." *Id.*

The sham litigation exception has an objective component and a subjective component. *Professional Real Estate Inv., Inc. v. Columbia Pictures Ind., Inc.,* 508 U.S. 49, 60-61 (1993). First, the lawsuit must be objectively baseless. *Id.* at 60. A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *Id.* If a reasonable litigant could reasonably expect success on the merits, the suit will be immunized under the *Noerr-Pennington* Doctrine. *Id.* If the court concludes that the lawsuit is objectively baseless, it may then, and only then, proceed to the second step of the inquiry to examine the litigant's subjective intent in filing the lawsuit. *Id.* at 61. This second step focuses on whether the plaintiff filed the lawsuit with the subjective intent to directly interfere with the business relationships of a competitor. *Id.*

Once the doctrine is implicated, courts have required the plaintiff to plead specific facts to show that the opponent's activities are not protected by *Noerr-Pennington*. *Cf. Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998) (stating that "when a plaintiff seeks damages for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required") (internal quotation marks and ellipses omitted); *Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd, Inc.*, 118 F. Supp.3d 646, 655-57 (D.N.J. 2015) (denying Rule 12(b)(6) motion on the

6

grounds that in its counterclaim defendant plausibly alleged facts sufficient to overcome plaintiff's *Noerr-Pennington* immunity); *In re Skelaxin (Metaxalone) Lit.*, No. 1:12-md-2343, 2013 WL 2181185, at \*\*18-19 (E.D. Tenn. May 20, 2013) (denying defendant's Rule 12(b)(6) motion on the grounds that plaintiff plausibly pled facts establishing sham litigation exception).

### 1. Count V: Unfair Competition Through Malicious Litigation

Count V of DDC's counterclaim alleges that Ancestry engaged in unfair competition by filing an objectively baseless lawsuit against it with the intent to injure its ability to be competitive.

While unfair competition generally occurs when one person falsely represents that his goods are the goods of another, it also covers lawsuits filed with the purpose of gaining an unfair advantage over a competing business. *Microsoft Corp. v. Action Software*, 136 F. Supp. 2d 735, 739-40 (N.D. Ohio 2001). Unfair competition extends to unfair commercial practices such as malicious litigation, and occurs when "the litigation was not founded upon good faith, but was instituted with the intent and purpose of harassing and injuring a rival producing and selling the same commodity." *Id.* at 740 (quoting *Henry Gehring Co. v. McCue*, 154 N.E. 171, 171 (Ohio Ct. App. 1926)). Additionally, "unfair competition may also extend to the circulation of false rumors, or publication of statements, all designed to harm the business of another." *Molten Metal Equip. v. Metaullics Sys., Co. L.P.*, No. 76407, 2000 Ohio App. LEXIS 2538, at \*15 (Ohio Ct. App. June 8, 2000).

In order to establish a claim of unfair competition through malicious litigation, the plaintiff must plead facts establishing the sham exception to *Noerr Pennington*, i.e., that the opposing party filed an objectively baseless lawsuit with the subjective intent to injure the party's ability to be competitive. *American Chem. Society v. Leadscope, Inc.*, 978 N.E.2d 832, 839 (Ohio 2012). In this case, DDC has not pled sufficient facts to plausibly infer that Ancestry's trademark infringement lawsuit is objectively baseless. Accordingly, Ancestry is entitled to dismissal of DDC's unfair competition by malicious litigation claim.

After reading the complaint and DDC's counterclaim, the Court concludes that Ancestry had a good faith basis to file a suit for trademark infringement. Ancestry alleges a plethora of facts that suggest an objective basis for the lawsuit, including Ancestry's belief that DDC was using its registered mark "AncestryDNA" in advertisements, and that, as a result, customer confusion has occurred, damaging Ancestry and its brand. Amended Complaint ¶¶ 19, 38.[1] DDC has not pled facts sufficient to plausibly infer that a reasonable litigant would not expect success on the merits of a trademark infringement suit based on these allegations. Indeed, as Ancestry accurately observes, DDC's failure to move for dismissal of its trademark infringement claims lends additional support to the conclusion that these claims are not objectively baseless. Doc. No. 51 at 7.

---

[1] Indeed, the preliminary injunction hearing established actual customer confusion between Ancestry's product and DDC's product. While the Court did indicate that it was more likely than not a case of reverse confusion, responsibility for the source of confusion has not been conclusively established. Doc. No. 60, at 6.

Additionally, the *Noerr-Pennington* Doctrine "provides that litigation activity (including pre-litigation cease-and-desist letters) cannot form the basis of liability unless the litigation is a 'sham.'" *Rock River Commc'n., Inc. v. Universal Music Group, Inc.*, 745 F.3d 343, 347 n.1 (9th Cir. 2014); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 637 (E.D. Mich. 2000) ("*Noerr-Pennington* immunity has been extended to non-sham, pre-litigation threats of suit, demand letters, and communications about pending suits."). As long as there is an "objectively reasonable effort to litigate," a lawsuit "cannot be a sham regardless of subjective intent." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 57 (1993). Consequently, to the extent that DDC alleges that Ancestry engaged in unfair competition by filing a complaint with Groupon about alleged infringement by DDC, this activity is also protected by *Noerr-Pennington*.

Finally, DDC's conclusory allegation that Ancestry filed its trademark infringement claims in bad faith is insufficient to overcome *Noerr-Pennington* immunity. *Cf. DIRECTV, Inc. v. Rayborn*, No. 5:03-CV-59, 2003 U.S. Dist. LEXIS 19680, at *21 (W.D. Mich. Oct. 20, 2003) ("[I]f a bare allegation of bad faith litigation were sufficient to defeat the *Noerr-Pennington* bar, every claimant would be able to avoid the intent of the Supreme Court merely by alleging bad faith on the part of the party seeking to enforce [its rights].").

Since DDC's counterclaim fails to establish that Ancestry's trademark infringement claims are objectively baseless, the Court need not consider Ancestry's subjective intent in filing suit against DDC. *Professional Real Estate Inv.,* 508 U.S. at 61.

9

In summary, DDC has not alleged facts sufficient to plausibly conclude that Ancestry engaged in unfair competition by filing its trademark infringement suit against DDC. Accordingly, Ancestry is entitled to dismissal of DDC's unfair competition by malicious litigation claim.

### 2. Common Law Unfair Competition: Count VI

In Count VI of its counterclaim, DDC alleges common law unfair competition by Ancestry and incorporates by reference "all allegations in all preceding paragraphs of this pleading." Counterclaim ¶ 73.

Common law unfair competition covers many kinds of unlawful or deceptive business practices, from filing malicious lawsuits in order to gain a competitive advantage to trademark infringement. *Leadscope*, 978 N.E.2d at 389; *Lavanty v. Nicolinni's Ristorante I & II, LLC*, ___N.E.3d___, No. 12 MA 151, 2015 WL 9461347, at *3 (Ohio Ct. App. Dec. 22, 2015). As stated above, DDC's counterclaim fails to plausibly indicate that Ancestry is not entitled to *Noerr-Pennington* immunity for its litigation-related activities. Consequently, to the extent that Count VI could be construed to include or overlap the malicious litigation claim asserted in Count V, Ancestry is entitled to dismissal of Count VI. To the extent, however, that Count VI covers common law trademark infringement and other non-litigation-related forms of unfair competition, those activities are not protected by *Noerr-Pennington*. To that extent, therefore, Ancestry is not entitled to dismissal of Count VI.

### 3. Tortious Inference With Business Relationships: Count VIII

In Count VIII, DDC alleges that Ancestry "submitted a false claim of trademark infringement against DDC to Groupon" with the "specific intent that DDC's prospective business relationships with Groupon and Groupon customers would terminate and not materialize." Counterclaim ¶¶ 80-82. Further, DDC alleges that, upon information and belief, Ancestry "tortiously interfered with DDC's prospective business relationships with DNA testing customers . . . through a publicity campaign which has resulted in public statements, including online statements published by third-party bloggers, that incorrectly blame DDC for the confusion that Ancestry's trademark infringement has caused and falsely portray DDC as an unethical company." *Id.* ¶ 83. In summary, DDC concludes that Ancestry "tortiously interfered with DDC's business relationships with actual malice and by wrongful means." *Id.* ¶ 84. DDC's tortious inference claim appears to have two facets: 1) that Ancestry interfered with its existing business relationship with Groupon; and 2) that Ancestry interfered with its prospective business relationships in the form of consumers who would have purchased its DNA testing kit but for Ancestry's actions.

Under Ohio law, to recover for a claim of tortious interference with a contractual relationship, "one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). The "torts of interference with business relationships and contract rights

11

generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *Barilla v. Patella*, 760 N.E.2d 898, 904 (Ohio Ct. App. 2001).

In this case, *Noerr-Pennington* applies to Ancestry's alleged tortious interference with DDC's relationship with Groupon. As already noted, *Noerr-Pennington* covers a party's actions in sending cease-and-desist letters unless the threatened suit is a sham. *Rock River Commc'n.*, 745 F.3d at 351; *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 637 ("*Noerr-Pennington* immunity has been extended to non-sham, pre-litigation threats of suit, demand letters, and communications about pending suits."). Thus, Ancestry's pre-litigation filing of a complaint with Groupon is protected by the *Noerr-Pennington* doctrine. And, as previously discussed, there are no factual allegations to indicate that Ancestry's trademark infringement lawsuit is a sham. Therefore, even taking DDC's allegations as true, Ancestry is entitled to immunity as to this aspect of DDC's tortious interference claim.

DDC also claims that Ancestry tortiously interfered with its business relationships with potential buyers of its DNA testing kit by publicly blaming it for confusion in the marketplace and by falsely portraying it as an unethical company. DDC alleges that Ancestry's statements have caused prospective customers to not purchase its test kits. The tortious interference doctrine is broad enough to protect a party's prospective business relationship with the general public. *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 611

N.E.2d 955, 960-61 (Ohio Ct. App. 1992); *see also id.* at 960 ("[T]he common law right of action protects *all* advantageous business relations, real or potential, from improper interference."). In its motion to dismiss, however, Ancestry argues that DDC has failed to state essential facts such as "what the alleged publicity campaign consisted of or how it was conducted." Doc. No. 51 at 14. Ancestry argues further that it is not liable for the conduct of third-party internet bloggers who made negative statements about DDC without any prompting by Ancestry. Doc. No. 51 at 14.

A claim for tortious interference with a prospective business relationship requires a showing that the defendant wrongfully caused a third person not to enter into a prospective business relationship with the plaintiff or prevented the plaintiff from acquiring the business relationship. *Dryden v. Cincinnati Bell Tel. Co.*, 734 N.E.2d 409, 413 (Ohio Ct. App. 1999). Otherwise, the elements of the two interference claims are the same. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780-81 (Ohio Ct. App. 2002). A claim for tortious inference can be based on the defendant's disparaging comments about the plaintiff's goods, services, or business if the plaintiff establishes that the defendant made the statements with actual knowledge that the statements were false or that the defendant made the statements with reckless disregard as to their truth or falsity. *A&B-Abell Elev. Co. v. Columbus/Cent. Ohio Bldg & Constr. Trade Council*, 651 N.E.2d 1283, 1294-95 (Ohio 1995). *Noerr-Pennington* does not apply to this kind of tortious interference because the doctrine only protects a party's attempt to defend its rights through litigation or

13

pre-litigation activities—not through alleged disparaging publicity campaigns. *Cf. MCI Commc'n Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1160 (7th Cir. 1983)("The *Noerr-Pennington* doctrine is concerned solely with the right to attempt to influence government action. It thus immunizes only those actions directed toward government agencies or officials."). Accordingly, in order to withstand Ancestry's motion to dismiss, DDC only needs to have sufficiently pled a claim for tortious interference with prospective business relations.

Here, while the Court agrees that Ancestry cannot be held liable for the disparaging comments of third parties, DDC has alleged that Ancestry, with actual malice, falsely blamed it for confusion in the market place and falsely characterized it as being an unethical company, and these statements caused prospective customers to forego purchasing its DNA kit. Counterclaim ¶ 83. These allegations are sufficient to state a claim for tortious interference with prospective business relationships. *A&B Abell,* 651 N.E.2d at 1295; *Akron-Canton*, 611 N.E.2d at 960-61; Fed. R. Civ. P. 9(b) (providing that malice may be pled generally).

Accordingly, to the extent that Count VIII is based on Ancestry filing a complaint with Groupon, the motion to dismiss is well-taken and is **GRANTED**; to the extent that Count VIII is based on Ancestry's alleged tortious interference with prospective purchasers of DDC's DNA testing kit, Ancestry's motion to dismiss is not well-taken and is **DENIED.**

Conclusion

For the reasons stated above, Ancestry's motion to dismiss is **GRANTED IN PART AND DENIED IN PART.** Ancestry's motion to dismiss is well-taken and is **GRANTED** as to Count V of DDC's counterclaim and the portions of Count VI and VIII that are based on Ancestry's litigation activities such as filing the lawsuit and complaining to Groupon about alleged infringement by DDC.  Those claims are **DISMISSED WITH PREJUDICE.** Ancestry's motion to dismiss is not well-taken and is **DENIED** as to that part of Count VI that covers other modes of unfair competition, and that part of Count VIII that is based on Ancestry's alleged disparaging comments about DDC.

**IT IS SO ORDERED**

Date July 26, 2016                         s/Sandra S. Beckwith
                                                   Sandra S. Beckwith
                                           Senior United States District Judge